366 S.E.2d 135

**GREYHOUND LINES–EAST, an OPERATING DIVISION OF GREYHOUND LINES, INC., a corporation, and Amalgamated Transit Union AFL–CIO, CLC, Division 1493**

v.

**Berley GEIGER, Jr., et al., and the West Virginia Human Rights Commission.**

No. 17527.

Supreme Court of Appeals of West Virginia.

Feb. 1, 1988.

---

David D. Johnson, III, Charleston, Richard Stanton, Chicago, Ill., for Greyhound Lines and Amalgamated Transit Union.

Tom Hindes, Deputy Atty. Gen., Charleston, for W.V. Human Rights Com'n.

Allan N. Karlin, Franklin Cleckley, Morgantown, for amicus curiae.

MILLER, Justice:

The West Virginia Human Rights Commission (Commission) and the complainant, Berley Geiger, Jr., appeal from a final order of the Circuit Court of Kanawha County pursuant to the West Virginia Administrative Procedures Act, W.Va.Code, 29A–6–1. For the reasons set forth herein, we affirm in part, reverse in part, and remand for further proceedings.

This case was previously before this Court in *Greyhound Lines–East v. Geiger*, 168 W.Va. 229, 283 S.E.2d 858 (1981) (Greyhound I), where we reversed the lower court's holding based upon our decision in *West Virginia Human Rights Comm'n v. United Transp. Union Local No. 655*, 167 W.Va. 282, 280 S.E.2d 653 (1981). In that case, we concluded that the West Virginia Human Rights Act differed from the federal Civil Rights Act of 1964 in that it did not contain an exemption immunizing bona fide seniority systems that perpetuate prior discriminatory practices as did the federal act under Section 703(h), 42 U.S.C. § 2000e–2(h).[1]

We also held in *United Transp. Union* that the operation of a facially neutral seniority system which has the effect of perpetuating pre-Act discrimination is unlawful and constitutes a continuing violation of our Human Rights Act,[2] as stated in Syllabus Points 3, 4, and 5:

"3. Our human rights act prohibits present practices that perpetuate pre-Act discrimination by freezing employees into inferior positions. W.Va.Code, 5–11–9.

"4. W.Va.Code, 5–11–9, does not immunize 'bona fide competitive-status based' seniority systems from proscriptions against unlawful practices.

"5. Prior discriminatory practices perpetuated by facially neutral seniority systems are continuous violations of the West Virginia Human Rights Act. W.Va.Code, 5–11–1, *et seq.*"

*Greyhound I* was remanded to the circuit court to determine whether the complainant had proven that he had been a victim of discrimination during the initial period of his employment with Greyhound Lines–East (Greyhound). The complainant had been hired initially as a porter on August 8, 1963. He alleged that he wanted to be a bus driver when he was hired, but did not apply for that position because the company at that time did not hire blacks as bus drivers. The circuit court on remand concluded that the evidence before the Commission did not support a finding of discrimination since the complainant had not applied for the bus driver position until sometime in late 1967 or early 1968, at which point he was accepted into Greyhound's next driver training school and was given a position as a bus driver.

---

1. The United States Supreme Court found such an exemption to exist in *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

2. When we refer to pre-Act discrimination, we refer to unlawful discriminatory practices that occurred before the July 1, 1967 amendments to the West Virginia Human Rights Act.

The circuit court determined that the evidence would not support a finding that he had desired to be an operator at the time of his initial employment application. The lower court also concluded that the Commission erred in treating the complaint as an administrative class action made on behalf of all similarly situated black employees.

## I.

The threshold issue presented here is whether the evidence supports the Commission's finding that Mr. Geiger was a victim of discrimination and entitled to relief. In reviewing the factual determinations made by administrative agencies, including the Commission, we have recognized that the scope of judicial review is narrowly circumscribed by the provisions of the Administrative Procedures Act, as stated in Syllabus Point 3 of *State ex rel. Human Rights Comm'n v. Logan–Mingo Area Mental Health Agency, Inc.*, 174 W.Va. 711, 329 S.E.2d 77 (1985):

" 'Upon judicial review of a contested case under the West Virginia Administrative Procedure Act, Chapter 29A, Article 5, Section 4(g), the circuit court may affirm the order or decision of the agency or remand the case for further proceedings. The circuit court shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are: "(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law; or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." ' Syl. pt. 2, *Shepherdstown VFD v. West Virginia Human Rights Commission*, [172] W.Va. [627], 309 S.E.2d 342 (1983)."

We also held in *Logan–Mingo*, in accord with federal decisions, that an administrative ruling that an employer has engaged in discrimination is a question of fact, as stated in Syllabus Point 5:

"A determination, by the West Virginia Human Rights Commission, that an employer has accorded disparate treatment to members of different races, is a finding of fact which may not be reversed by a circuit court upon review, unless such finding is clearly wrong in view of the reliable, probative and substantial evidence on the whole record."

The record reveals the following facts. Mr. Geiger, a black employee of Greyhound, began work at its Charleston terminal in 1963 as a platform terminal worker, or porter. At the time of his employment, all porters at the Charleston terminal were black while all bus operators or drivers were white. It is undisputed that no black driver was hired at the Charleston terminal until April, 1967, when S.V. Dalton applied for and successfully completed a training school for bus operators. Prior to 1967, two black drivers had been transferred to Charleston for brief periods as a result of furlough and bumping procedures under a collective bargaining agreement and then returned to their home terminals in other states. In 1973, when the public hearings were conducted in this case, there were approximately 113 bus operators in Charleston. Only four of these were black, and they were hired in 1967 or later.

Mr. Geiger testified that at the time of his application for employment with Greyhound he did not apply for a position as a bus operator because he knew of no blacks that were drivers with Greyhound and he knew of no other position that blacks were employed in other than porters or janitors. Consequently, he applied for the position of porter. Mr. Geiger testified that he had wanted to be a driver perhaps since junior high school.

At the time of his application, Mr. Geiger met the hiring requirements to become a driver, which included age, height, vision, health, and prior driving record. Although Greyhound and union officials denied en-

gaging in discriminatory practices, Ceybert Smith, a black employee of Greyhound, testified that when he had made inquiry in 1960 to a company representative about becoming a driver, he was told "there was no one black on the lines[,] period."

In 1968, Mr. Geiger successfully completed training to become a bus operator and transferred from his position as a porter to a bus operator. Under the provisions of the collective bargaining agreement, Mr. Geiger's seniority date as an operator began upon completion of his training as a bus operator on May 3, 1968. Mr. Geiger in 1971 sought the assistance of the union to convert his seniority date to his initial date of hire in 1963, but neither the company nor the union was willing to allow any modification of his operator's seniority date.

Mr. Geiger then filed his complaint with the Commission, asserting that the company and the union were perpetuating the effects of past discriminatory employment practices by refusing to recognize the date of his initial employment with the company as his seniority date as a bus operator. The union was made a respondent because it was a party to the collective bargaining agreement and all employees were required to apply for union membership after being hired.

After evidentiary hearings, the Commission entered an order declaring that neutral employment practices and procedures which perpetuate the effects of previous racial discrimination constitute an unlawful employment practice. The Commission found that blacks had been excluded from the operator job classification prior to 1964 based upon testimony and statistical evidence. Seniority was found to be of critical importance in bidding for work assignments, determining vacation schedules, and earnings. The Commission concluded that the seniority system "locked in" the prior discrimination.

The Commission ordered the company and the union to cease and desist from engaging in any employment practices which perpetuate the effects of past dis-

crimination. Mr. Geiger was awarded back pay from July 1, 1967, to the date of the Commission's order based upon a comparison of his annual earnings with the average earnings of the three white drivers hired nearest to the date of Mr. Geiger's application in August, 1963. In determining the amount of backpay, the employer's records were to be made available to Mr. Geiger and the backpay was to be paid one-half by the company and one-half by the union.

We conclude that substantial evidence supports the Commission's finding that the company had engaged in a pattern and practice of discrimination against blacks by employing them only as porters, janitors, and maids and by prohibiting them from bidding on other job classifications prior to the enactment of Title VII.[3] It appears from the evidence that the company ceased this discriminatory practice around November 1, 1964, when a collective bargaining agreement became effective which permitted blacks to bid on all jobs within the terminal under certain rather limited circumstances. The Commission also correctly concluded that the union violated the Human Rights Act by negotiating collective bargaining agreements containing seniority provisions perpetuating the past discrimination against Mr. Geiger.

At the time of Mr. Geiger's employment in 1963, employees at the Charleston terminal were divided into two groups or departments with separate departmental seniority rosters. Operators constituted a separate seniority group. The collective bargaining agreement, effective November 1, 1964, permitted blacks who had been employed exclusively in Group B—as porters, janitors, and maids—to bid on jobs in Group A, which consisted of all other job classifications within the terminal, such as ticket agents, counter information clerks, travel bureau clerks, and express clerks.

Group A jobs had been formerly reserved exclusively for whites. The agreement, however, did not permit the black employees in Group B to bid on a Group A

3. Title VII of the Civil Rights Act of 1964 did not become effective until July 2, 1965.

vacancy or new position unless no employee in Group A had bid on the position. This provision of the contract in operation gave a preference to white employees for Group A jobs to the continuing detriment of black employees, and vividly discloses the evolutionary nature of the employment policies of both the company and the union. A clean break with the past did not take place.

Having determined that the evidence supports the Commission's finding of a pattern and practice of discrimination, we now turn to what remedy, if any, Mr. Geiger is entitled to in this proceeding. In *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Supreme Court discussed awards of retroactive seniority at some length where a pattern and practice of discrimination had been established, and drew heavily from its decision the previous year in *Franks v. Bowman Transp. Co., Inc.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).[4] In discussing this remedy, the Court ruled that incumbent employees who had been deterred from applying for a position because of the employer's unlawful discriminatory practices could be awarded retroactive seniority.

In *Teamsters*, the government proved that the company had engaged in a pattern and practice of discriminating against negroes and Spanish-surnamed persons who were hired only as local city drivers, which were lower paying and less desirable jobs. Jobs as line drivers or over-the-road long-distance drivers had been reserved for white individuals. The seniority system in the collective bargaining agreement "locked in" the effects of past racial and ethnic discrimination and perpetuated the prior discrimination, because upon a city driver's transfer to a line driver job he forfeited all competitive seniority accumulated in the previous bargaining unit and started at the bottom of the line drivers' seniority list.

The Supreme Court concluded that during the period of the pattern and practice of discrimination, any employee who had unsuccessfully applied for a job was entitled to an inference or presumption that he had been discriminated against and the burden was then on the employer to demonstrate that the individual applicant was denied employment for lawful reasons.

The Court noted that nonapplicants could also obtain relief, but would have the "not always easy burden of proving that he would have applied for the job had it not been for those [discriminatory] practices." 431 U.S. at 368, 97 S.Ct. at 1871, 52 L.Ed.2d at 435. However, once that burden is met, the nonapplicant is in a position analogous to that of an applicant and is entitled to an inference that he would have been discriminated against, casting the burden on the employer to demonstrate he would have been denied employment for lawful reasons. The Supreme Court stated in *Teamsters*, 431 U.S. at 365, 97 S.Ct. at 1869–70, 52 L.Ed.2d at 433–34:

"Measured against these standards, the company's assertion that a person who has not actually applied for a job can never be awarded seniority relief cannot prevail. The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who were expressly denied a requested employment opportunity. A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection."

Several courts of appeals had previously held in Title VII cases that a nonapplicant would be entitled to make-whole relief

---

**4.** The Supreme Court of New Jersey in *Terry v. Mercer County Bd. of Chosen Freeholders*, 86 N.J. 141, 430 A.2d 194 (1981), recently upheld the power of its state anti-discrimination agency to award retroactive seniority under a statute much like ours which grants broad remedial powers to the agency to effectuate the purposes of the law. The court looked to federal cases, particularly *Franks, supra*, and upheld an order in a sex discrimination case which included a requirement that three female public employees be appointed to the first available supervisory positions and awarded retroactive seniority to the date they would have been promoted but for the discrimination. No challenge to the power of the Commission to grant retroactive seniority relief to victims of discrimination was made in that proceeding.

when an application would have been a useless act serving only to confirm a discriminatee's knowledge that the job he wanted was unavailable to him. *Hairston v. McLean Trucking Co.*, 520 F.2d 226, 231–33 (4th Cir.1975); *Bing v. Roadway Express, Inc.*, 485 F.2d 441, 451 (5th Cir.1973); *United States v. N.L. Industries, Inc.*, 479 F.2d 354, 369 (8th Cir.1973).

In determining whether a nonapplicant is entitled to relief under federal law, courts since *Teamsters* have looked to whether the nonapplicant subjectively believed it would be futile to apply for the position and to whether this belief was objectively reasonable. *See Reed v. Lockheed Aircraft Corp.*, 613 F.2d 757, 761–62 (9th Cir. 1980); *Garrett v. Okaloosa County*, 734 F.2d 621, 625 (11th Cir.1984).

We believe the circuit court's conclusion in this case that Mr. Geiger was not discriminated against and entitled to seniority relief is not supported by a reasonable appraisal of the evidence. The Commission found that Mr. Geiger applied for a porter position in 1963, because he knew there was an opening for that position and because he knew that blacks at that time were only hired as porters, maids, and janitors. The Commission's implicit finding that Mr. Geiger desired to be an operator from the outset of his employment is supported by substantial evidence. Mr. Geiger testified as to that aspiration and we think his subsequent actions tend to confirm that this was his occupational goal.

The company had participated for many years in a practice of hiring blacks only for the least desirable jobs. The record shows that Mr. Geiger was well aware of this fact at the time he was hired. In the circumstances, it was objectively speaking quite reasonable for him to have believed that his operator application would have been rejected solely because of his race had he sought the position. It was not until the November 1, 1964, collective bargaining agreement that black terminal employees confined in Group B could even bid on Group A jobs within the terminal, and even then this right was conditioned on no Group A employee bidding on the job.

The Commission correctly determined that under the collective bargaining agreement, the company maintains a departmental seniority roster for operators which is based only on their work experience as an operator. Operator seniority under the contract is the basis upon which work assignments and vacation time are determined among operators. Because of the initial discrimination against Mr. Geiger, the seniority provisions of the collective bargaining agreement, although neutral on their face, perpetuate the effects of the past discrimination against Mr. Geiger. All of the white operators hired in 1964 have more operator seniority than he. But for the discrimination, Mr. Geiger would have had an earlier seniority date and would have enjoyed the substantial benefits of that increased seniority throughout the years.

The evidence supports the Commission's determination that Mr. Geiger has been and remains a victim of the racially discriminatory employment practices of the company and the union and that he continues to suffer the effects of that discrimination by virtue of the operation of the seniority system. In view of the fact that this case has already been in litigation far too long, we think it appropriate to attempt resolution of the retroactive seniority issue here and now.

■ It is clear that Mr. Geiger should not receive retroactive seniority back to his hiring date in August, 1963. Courts have recognized that actual vacancies in an employer's workforce should be considered in fashioning relief to employees who have been discriminated against. *Russell v. American Tobacco Co.*, 528 F.2d 357 (4th Cir.1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1666, 48 L.Ed.2d 176 (1976); *Salinas v. Roadway Express, Inc.*, 802 F.2d 787, 789 (5th Cir.1986); *Sagers v. Yellow Freight Sys., Inc.*, 529 F.2d 721, 731–32, 38 A.L.R.Fed. 1 (5th Cir.1976); *Bing v. Roadway Express, Inc.*, 485 F.2d 441, 452 (5th Cir.1973). When Mr. Geiger was hired, no operator position was available for any employee, either white or black. He, therefore, did not become a victim of discrimina-

tion in connection with the operator position at that time. No operators were hired until April 10, 1964, when five drivers completed the operators school.

We believe Mr. Geiger's seniority date should be the same as the group of operators who completed the operator's school on April 10, 1964. But for his race, the evidence indicates he would have become an operator at that time and setting that as his seniority date is a just and appropriate remedy.

## II.

The next issue presented is whether the circuit court erred in reversing the Commissioner's order granting relief on behalf of all black employees hired before November 1, 1964. The Commission's order stated that the "[a]ffected [c]lass" included all black employees with a current employment relationship hired prior to November 1, 1964, in the Terminal Department, and that all members of the affected class should be entitled to bid or exercise seniority on a vacancy "outside of their department or classification" using their "terminal seniority" for such purposes.[5]

We recognize that the Commission is vested with the right to initiate complaints under W.Va.Code, 5–11–10: "The Commission upon its own initiative, or the attorney general, shall, in like manner, make, sign, and file such complaint." This section also grants to the Commission broad remedial powers:

"If, after such hearing and consideration of all of the testimony, evidence and record in the case, the commission shall find that a respondent has engaged in or is engaging in any unlawful discriminatory practice as defined in this article, the commission shall issue and cause to be served on such respondent an order to cease and desist from such unlawful discriminatory practice and to take such affirmative action, including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, admission or restoration to membership in any respondent labor organization ... as in the judgment of the commission, will effectuate the purposes of this article, and including a requirement for report of the manner of compliance."

*See, West Virginia Human Rights Commission v. Pearlman Realty Agency,* 161 W.Va. 1, 239 S.E.2d 145 (1977).

■ Most courts have concluded that a state civil rights commission may proceed by way of an administrative class action and order relief for similarly situated individuals who have been victims of unlawful discriminatory practices where the commission or its executive director is given the right to initiate complaints, as is the case under W.Va.Code, 5–11–10. *Hotel, Motel, Restaurant, Constr. Camp Employees & Bartenders Union Local 879 v. Thomas,* 551 P.2d 942, 947 (Alaska 1976); *Veeder-Root Co. v. Commission on Human Rights & Opportunities,* 165 Conn. 318, 334 A.2d 443 (1973); *Ferguson v. United Parcel Serv.,* 270 Md. 202, 311 A.2d 220 (1973), *cert. denied,* 415 U.S. 1000, 94 S.Ct. 1602, 39 L.Ed.2d 895 (1974); *Richardson v. School Bd. of I.S.D. No. 271,* 297 Minn. 91, 210 N.W.2d 911 (1973); *Jackson v. Concord Co.,* 54 N.J. 113, 253 A.2d 793 (1969); *Commonwealth of Pa. Human Relations Comm'n v. Freeport Area School Dist.,* 467 Pa. 522, 359 A.2d 724 (1976); *see also Arizona Civil Rights Div. v. Hughes Air Corp.,* 139 Ariz. 309, 678 P.2d 494 (1983) (power implied from broad enforcement remedies); *contra, Massachusetts Elect. Co. v. Massachusetts Comm'n Against*

---

5. The Commission's order also provided, in pertinent part, as follows:

"The relief afforded the complainant should enable the complainant, who was employed by the respondent company prior to the effective date of the federal civil rights act and the effective date of the West Virginia Human Rights Act, *and all those black employees similarly situated,* to exercise company seniority for all purposes, especially with respect to bidding work assignments, selecting time for vacation, etc. The relief should also allow blacks hired prior to November 1, 1964, to exercise their date of hire seniority when transferring to cross-departmental or interdepartmental jobs that were previously denied them. Only then will the past effects of discrimination be eradicated from the present operation of the systems maintained by the respondents." (Emphasis added).

*Discrimination*, 375 Mass. 160, 375 N.E.2d 1192 (1978).

■ Courts have also concluded, following the lead of the United States Supreme Court in *General Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980), that compliance with class action requirements under rules of civil procedure is not necessary in an administrative civil rights class action. *E.g., Arizona Civil Rights Div. v. Hughes Air Corp., supra.*

Those courts that have addressed this issue do indicate that some notice must be given to the employer that a class action is being undertaken, and some evidence is required about the individual damages suffered, if such individual relief is awarded.

The Supreme Court of Alaska recognized the need for particularity in pattern and practices cases and stated in note 20 of *Local 879*, 551 P.2d at 947:

"Specificity is particularly important when a complaint alleges prolonged discrimination against a class of persons. Without fair notice of the nature and scope of the charges filed, a party charged will neither have the opportunity to meaningfully prepare for the conciliation process, nor the ability to file a responsive answer...."

The Supreme Court of Pennsylvania upheld the power of the Pennsylvania Human Relations Commission (PHRC) to grant affirmative relief on behalf of similarly situated individuals upon a complaint made by an individual in *Freeport Area School Dist., supra.* The court concluded that the PHRC may order relief on behalf of persons not named in the complaint when the complaint alleges other persons have been affected by the discriminatory practice and such other persons can be described with some specificity.

The court, however, recognized that "[a]lthough PHRC, under the Act, has the power to order such relief, a failure to inform a respondent concerning the scope of investigation and possible relief might vitiate an otherwise lawful exercise of PHRC's authority." 467 Pa. at 529, 359 A.2d at 727–28. *See also Veeder–Root Co. v. Comm'n on Human Rights & Opportunities, supra.*

■ That is the problem we find with the Commission's order in this case. At the evidentiary hearing, there was no contention made by the counsel for the Commission that class relief was sought. At one point, counsel stated that he had no intention of "making inquiry into the terminal employees and their seniority system for the purpose of making a record necessary to modify that. That is not an issue here.... And I can assure you that it is not the position of the Commission to enter such an order."

There is nothing in the record that suggests that the Commission was seeking relief for other similarly situated black employees. There was no particularized testimony as to their damages. Given this situation, it can hardly be contended that the company and union were given notice that the Commission was seeking relief on behalf of all black employees hired during the period in which the company engaged in a pattern and practice of employment discrimination. For this reason, the Commission's granting of class relief cannot be upheld and the circuit court's ruling on this issue must be affirmed.

The judgment of the Circuit Court of Kanawha County is, therefore, affirmed in part, reversed in part, and remanded for the entry of a judgment in accordance with this opinion.

Affirmed in part, reversed in part, and remanded.