400 S.E.2d 245

**Patricia Ann PAXTON**

v.

**Paul CRABTREE, Administrative Director, West Virginia Supreme Court of Appeals, State of West Virginia, Velt King, Magistrate of Clay County.**

**No. 19615.**

Supreme Court of Appeals of
West Virginia.

Dec. 6, 1990.

Carter Zerbe, Charleston, for Patricia Ann Paxton.

Frank Venezia, Sterl F. Shinaberry & Assoc., L.C., Charleston, for Paul Crabtree.

Michael T. Clifford, Clifford & Mann, L.C., Charleston, for Velt King.

Roger W. Tompkins, Atty. Gen., Mike Kelly, Deputy Atty. Gen., Civil Rights Div., Charleston, for State.

MILLER, Justice:

On October 7, 1981, Patricia Ann Paxton was fired from her job as a magistrate assistant for Magistrate Velt King of Clay County (the Magistrate), ostensibly pursuant to W.Va.Code, 50–1–9 (1981).[1] On December 19, 1981, Mrs. Paxton, asserting that she was unlawfully discharged because she was pregnant, filed a complaint with the Human Rights Commission (HRC) against the Magistrate and Paul Crabtree, in his capacity as the Administrative Director of the Courts (the Administrative Director).[2]

In 1985, the HRC found that Mrs. Paxton had been discriminated against, but did not award her back pay. The Circuit Court of Kanawha County affirmed the HRC's finding of unlawful discrimination, but dismissed the Administrative Director from the case because he did not participate in the decision to terminate Mrs. Paxton's employment. The circuit court remanded the case to the HRC with instructions to award Mrs. Paxton back wages. In a supplemental order, dated March 16, 1988, the circuit court ordered Mrs. Paxton reinstated within thirty days. Mrs. Paxton was not reinstated.

After hearings before the HRC, Mrs. Paxton was awarded $41,167.99 in back pay and benefits, $29,765.63 in prejudgment interest, $12,978.07 in attorney's fees and costs, and $2,500 for incidental damages. This appeal followed.

The parties make the following assignments of error:

(1) Mrs. Paxton asserts that the HRC did not properly compute her wage loss when it gave her nothing for lost wages after the reinstatement order.

(2) The Magistrate argues that he was not properly made a defendant in the case, and that the $2,500 incidental damage

---

1. W.Va.Code, 50–1–9, provides, in relevant part: "In each county there shall be one magistrate assistant for each magistrate. Each magistrate assistant shall be appointed by the magistrate under whose authority and supervision and at whose will and pleasure he shall serve."

2. Mr. Crabtree retired from his position in 1988, and Mr. Ted Philyaw was appointed to succeed him.

award should be paid by the judicial system and not by him personally.

(3) The Administrative Director argues:

(a) The HRC erred in holding that the Magistrate is an employee of the West Virginia Supreme Court of Appeals;

(b) Even if the Magistrate is an employee of the West Virginia Supreme Court of Appeals, the judicial system should not have to pay the judgment rendered against him unless a superior in the system directed or ratified his acts; and

(c) The HRC erred in finding Mrs. Paxton had mitigated her damages by attempting to find alternative employment.

(4) The HRC argues that the Administrative Director's appeal was untimely filed.

None of the parties attack the HRC's central finding that Mrs. Paxton was a victim of discrimination.[3]

## I.

### PROCEDURAL ISSUES

#### A.

■ We reject the Magistrate's contention that he was not properly made a defendant in the case because Mrs. Paxton initially filed suit against the "Clay County Office of the Magistrate," but failed to name him personally. In November, 1983, Mrs. Paxton amended her complaint to name the Magistrate. The Magistrate demonstrates no specific prejudice arising from the delay in naming him in the proceedings. He was aware of the amended complaint and participated through counsel in all relevant hearings. This is not a case where substantial procedural defects occurred such as those we outlined in Syllabus Point 4 of *McJunkin Corp. v. West Virginia Human Rights Commission*, 179 W.Va. 417, 369 S.E.2d 720 (1988):

"Where an issue is not raised by the complainant in a complaint to the West Virginia Human Rights Commission, the Commission's hearing examiner is pre-cluded from independently raising the issue and deciding it on the merits where the respondent has not received adequate notice of the issue in the form of a complaint or an amendment thereto nor had an opportunity to defend his or her position, provided that the issue not raised in the complaint or an amendment thereto is not heard by the express or implied consent of the parties."

*Cf. Greyhound Lines–East v. Geiger*, 179 W.Va. 174, 366 S.E.2d 135 (1988).

■ The Human Rights Act "shall be liberally construed to accomplish its objective and purposes." W.Va.Code, 5–11–15 (1967). This construction applies to both its substantive and procedural provisions, and is consonant with this Court's view that administrative proceedings should not be constrained by undue technicalities. *See Spahr v. Preston County Bd. of Educ.*, 182 W.Va. 726, 391 S.E.2d 739 (1990).

#### B.

We also reject the HRC's argument that the Administrative Director's appeal period has expired and that he therefore cannot challenge either the back pay award or the court's holding that it was payable from the judicial budget. The circuit court acted as an appellate court in reviewing the HRC's order of October 4, 1985. It reversed the HRC and remanded the case for a back pay award to Mrs. Paxton. The HRC argues that at this point the Administrative Director knew that the case had been remanded for a back pay award payable from the judicial budget. Consequently, the HRC argues that the Administrative Director should have appealed these adverse rulings to this Court.

■ Because the circuit court remanded the case for further factual development, the Administrative Director was not required to appeal immediately. The authorities relied upon by the HRC relate to ap-

---

**3.** We held in Syllabus Point 2 of *Frank's Shoe Store v. Human Rights Commission*, 179 W.Va. 53, 365 S.E.2d 251 (1986): "Discrimination based upon pregnancy constitutes illegal sex discrimination under the West Virginia Human Rights Act, *W.Va.Code*, 5–11–9(e) [1981]."

peals of final orders of a trial court.[4] By remanding, the circuit court issued an interlocutory, rather than a final, order. Where an intermediate appeals court remands for further proceedings, its order, in the absence of some specific statute, is ordinarily not appealable:[5]

> "Ordinarily a judgment of reversal rendered by an intermediate appellate court which remands the cause for further proceedings in conformity with the opinion of the appellate court is not final and, therefore, not appealable to the higher appellate court, so long as judicial action in the lower court is required." 4 Am.Jur.2d *Appeal & Error* § 59 at 580 (1962).

*See City & Borough of Juneau v. Thibodeau,* 595 P.2d 626 (Alaska 1979); *Cory Corp. v. Fitzgerald,* 403 Ill. 409, 86 N.E.2d 363 (1949); *Kitchen & Kutchin, Inc. v. Jarry Elecs., Ltd.,* 382 Mass. 689, 414 N.E.2d 1004 (1981); *Southern Saw & Mower Distribs., Inc. v. Dolmar N. Am. Corp.,* 317 So.2d 400 (Miss.1975); *Martin v. Zweygardt,* 199 Neb. 770, 261 N.W.2d 379 (1978); *New York State Elec. Corp. v. Public Serv. Comm'n,* 260 N.Y. 32, 182 N.E. 237 (1932); *Barker v. Daniels,* 195 Okla. 690, 161 P.2d 854 (1945).

This rule, however, is limited to those situations where the intermediate appellate court finds that there are disputed issues of fact or law that have not been resolved by the trial court. As a result, remand is proper in order to have all issues fully resolved, rather than to have an appeal on a piecemeal basis. This general rule does not apply to situations where the trial court has reversed or affirmed the agency decision on the merits. *See Moore v. New York Cotton Exch.,* 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926); *Thomas v. Rich-*

*ards,* 13 Ill.2d 311, 148 N.E.2d 740 (1958); *Cory Corp. v. Fitzgerald, supra; Demirdjian v. Star Mkt. Co.* 381 Mass. 778, 412 N.E.2d 876 (1980); *Martin v. Zweygardt, supra.*[6]

■ Here the circuit court remanded the case to determine the amount of Mrs. Paxton's wage loss claim. There was also a factual question on whether Mrs. Paxton attempted to mitigate her damages. To this extent, all issues had not been finally resolved at the intermediate appeal stage. Consequently, we hold that the Administrative Director's appeal was timely.

## II.

## THE WAGE LOSS CLAIM

### A.

Mrs. Paxton claims that she was not given full back pay, which she believes should extend from the time she was unlawfully discharged until the Magistrate left office on December 31, 1988. The Administrative Director contends that because Mrs. Paxton failed to mitigate her damages she is not entitled to obtain any wage losses during this period.

■ We address the mitigation issue first. In Syllabus Point 2 of *Mason County Board of Education v. State Superintendent of Schools,* 170 W.Va. 632, 295 S.E.2d 719 (1982), we held:

> "Unless a wrongful discharge is malicious, the wrongfully discharged employee has a duty to mitigate damages by accepting similar employment to that contemplated by his or her contract if it is available in the local area, and the actual wages received, or the wages the employee could have received at compa-

---

4. *See Morrison v. Leach,* 75 W.Va. 468, 84 S.E. 177 (1915); *Hoy v. Hughes,* 27 W.Va. 778 (1886); *Lloyd v. Kyle,* 26 W.Va. 534 (1885).

5. This case was decided before the 1989 amendment to W.Va.Code, 5–11–11, which permits a direct appeal from the HRC to this Court. Prior to this amendment, this section provided for an appeal to the Circuit Court of Kanawha County with the right to then appeal to this Court. Prior to the 1989 amendment, there was no

special statutory provision that altered the general rule regarding appealability from an intermediate court.

6. We recognize that this case is an appeal from an administrative agency to a circuit court and that the scope of review is traditionally set by statute. *See* W.Va.Code, 29A–5–4(g). However, we believe that the general appealability principles still apply.

rable employment where it is locally available, will be deducted from any back pay award; however, the burden of raising the issue of mitigation is on the employer." [7]

This same rule applies to recovery of wage loss in our human rights cases, as we stated in *Bishop Coal Co. v. Salyers*, 181 W.Va. 71, 79, 380 S.E.2d 238, 246 (1989), where we recognized that "back pay is specifically authorized by W.Va.Code, 5–11–10 (1987)." *Cf. Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983), *cert. denied*, 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984).

The Administrative Director's argument is flawed because it fails to recognize that the employer has the burden of proving that the employee failed to mitigate damages. We referred to the employer's burden in both Syllabus Point 2 of *Mason County Board of Education*, and in the discussion in the text:

"The authorities have pointed out that 'duty' in this context is an inaccurate mode of expression. 11 S. Williston, *Contracts* § 1359 (3d Ed.1968); 5 A. Corbin, *Contracts* § 1095 (1964). The employee is in fact under no affirmative 'duty' to seek employment; he may seek it or not, at his pleasure. However, should employment similar to that contemplated by his breached contract be locally available to him, he will be charged, in mitigation of his damages, the amount of the salary he would have earned at that employment....

\* \* \* \* \* \*

"... While mitigation of damages is an affirmative defense that must be proved by the party that has breached the contract, nonetheless, the wrongfully discharged employee who has not secured employment must be prepared to demonstrate that he or she did not make a voluntary decision not to work, but rather used reasonable and diligent efforts to secure acceptable employment." 637–38 W.Va. at 170, 295 S.E.2d at 724–26.

In this case, there was no evidence that there were comparable jobs available in Mrs. Paxton's locality. The only asserted available comparable job was an opening in the sheriff's office caused when the Magistrate hired an employee of the sheriff's office as Mrs. Paxton's replacement. There appears to have been no testimony offered about the comparability of the two jobs, or whether Mrs. Paxton would have been hired. At the time the opening became available, Mrs. Paxton was still recovering from her pregnancy. Mrs. Paxton and her husband testified about their efforts to find available comparable work in the locality and that none existed.

 We agree with the holding from one of the leading federal cases in this area, *Rasimas v. Michigan Department of Mental Health*, 714 F.2d 614, 623–24 (6th Cir.1983), *cert. denied*, 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984):

"Once a claimant establishes a prima facie case [of discrimination] and presents evidence on the issue of damages, the burden of producing sufficient evidence to establish the amount of interim earnings or lack of diligence shifts to the defendant.... The Defendant may satisfy his burden only if he establishes that: 1) there were substantially equivalent positions which were available; and 2) the claimant failed to use reasonable care and diligence in seeking such positions...." (Citations omitted).

*See also Sellers v. Delgado Community College*, 839 F.2d 1132 (5th Cir.1988); *E.E.O.C. v. Exxon Shipping Co.*, 745 F.2d 967 (5th Cir.1984); *Wooldridge v. Marlene Indus. Corp.*, 875 F.2d 540 (6th Cir.1989); *Department of Civil Rights v. Horizon Tube Fabricating, Inc.*, 148 Mich.App. 633, 385 N.W.2d 685 (1986). We find this holding compatible with the ruling in *Mason County Board of Education, supra*. We do not believe that the defendants met their burden of proving that Mrs. Paxton failed to mitigate her damages.

---

**7.** Mrs. Paxton asserts that her firing was malicious, and, therefore, under *Mason County Board of Education*, she was not required to mitigate her wage loss damages. The HRC did not find that the discharge was malicious, and we concur in this finding.

## B.

■ A related issue is the duration of Mrs. Paxton's claim for wage loss. For reasons that are not entirely clear from the record, the HRC, in its January 29, 1990 order, awarded back pay from October, 1981, to August 14, 1985, the date Mrs. Paxton was ordered to be reinstated by the HRC. Because she was not reinstated, Mrs. Paxton asserts that back pay should be awarded until December 31, 1988, the date the Magistrate retired from office.

In its order of March 16, 1988, the circuit court directed that Mrs. Paxton be reinstated within thirty days. A request to stay the order was denied, and Mrs. Paxton appeared for reinstatement at the Magistrate's office on April 17, 1988. Her request was denied. Mrs. Paxton states that she did not actively seek employment after the August, 1985 HRC reinstatement order because she believed she would be reinstated to her position.

The HRC cites *Orr v. Crowder, supra*, for the proposition that a person who has a reasonable expectation of being reinstated is not required to look for work. *Orr* does not stand for such a proposition, although it does contain this sentence: "Mrs. Orr did not make any job applications during the year of her terminal contract because she believed that she would eventually be reinstated to her position." 173 W.Va. at 351, 315 S.E.2d at 609. However, this statement is clarified by the following sentence, where we pointed out that a duty to mitigate did not exist while Mrs. Orr was still employed: "We fail to see how Mrs. Orr can be accused of failing to fulfill her duty to mitigate damages by not applying for other jobs at a time in which she was still employed." 173 W.Va. at 351, 315 S.E.2d at 609.

The critical point is that the employer failed to produce any evidence before this Court that there was comparable work available for Mrs. Paxton in Clay County at any time, including after August 15, 1985. We therefore find that the HRC erred in not calculating the wage loss to December 31, 1988.

## III.

The final question is whether the Administrative Director can be held liable. An interrelated issue is whether any judgment obtained is required to be paid from the judicial budget.

## A.

■ Initially, we need to determine whether the Administrative Director can be considered Mrs. Paxton's "employer." The Administrative Director urges us to analyze this issue under common law concepts of the employer-employee relationship. In Syllabus Point 5 of *Davis v. Fire Creek Fuel Co.*, 144 W.Va. 537, 109 S.E.2d 144 (1959), *overruled on other grounds, Yates v. Mancari*, 153 W.Va. 350, 168 S.E.2d 746 (1969), we formulated this general rule:

> "A request of a person to do certain work is only one of the elements to be considered in determining employment, other elements being compensation for such work and the power to discharge, but the most important element is the right or power of direction and control of the manner in which the work is to be performed."

This statement parallels the general common law test for determining whether there is a master-servant relationship, as stated in *Naccash v. Burger*, 223 Va. 406, 418–19, 290 S.E.2d 825, 832 (1982):

> "Four factors enter into determination of the question whether a master-servant relationship exists within the contemplation of the doctrine of respondeat superior, (1) selection and engagement of the servant, (2) payment of compensation, (3) power of dismissal, and (4) power of control. The first three factors are not essential to the existence of the relationship; the fourth, the power of control, is determinative." (Citations omitted).

*See generally* 53 Am.Jur.2d *Master & Servant* § 2 (1970 & Supp.1990).

■ It does appear in the context of a civil rights discrimination case that courts have used common law master-servant principles to determine whether there is an employer-employee relationship. Even though such a relationship has been found,

the general view is that the employer is ordinarily not automatically or vicariously liable for the misconduct of his employees.[8] *See Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Civil Rights Comm'n,* 394 N.W.2d 375 (Iowa 1986); *Tretter v. Liquipak Int'l, Inc.,* 356 N.W.2d 713 (Minn.App.1984); *Totem Taxi, Inc. v. New York State Human Rights Appeal Bd.,* 65 N.Y.2d 300, 491 N.Y.S.2d 293, 480 N.E.2d 1075 (1985); *Glasgow v. Georgia-Pacific Corp.,* 103 Wash.2d 401, 693 P.2d 708 (1985).[9]

In the civil rights area, particularly in federal cases, two different tests have developed for imposing liability on an employer for discriminatory acts of its employees. If a discriminatory act has been committed by an officer or a supervisory employee, an employer may be held liable without a showing that the employer knew or reasonably should have known of the misconduct, except if the supervisory employee was acting outside the scope of his employment.[10] Second, for the acts of non-supervisory employees, an employer can be found liable if he knew or reasonably should have known of the discriminatory acts, or expressly or impliedly authorized or ratified them. *Meritor Savings Bank v. Vinson, supra;*[11] *Figueroa v. Aponte-Rogue,* 864 F.2d 947 (1st Cir.1989); *Swen-*

---

8. "Employer's liability" is also known as *respondeat superior,* which we generally summarized in Syllabus Point 3 of *Musgrove v. Hickory Inn, Inc.,* 168 W.Va. 65, 281 S.E.2d 499 (1981):

> "An agent or employee can be held personally liable for his own torts against third parties and this personal liability is independent of his agency or employee relationship. Of course, if he is acting within the scope of his employment, then his principal or employer may also be held liable."

Employer's liability attaches regardless of whether the employer knew or should have known of the employee's negligence as long as the employee is acting within the scope of the employment. It is also termed "vicarious liability." *See Thomas v. Raleigh Gen. Hosp.,* 178 W.Va. 138, 358 S.E.2d 222 (1987); *Sanders v. Georgia-Pacific Corp.,* 159 W.Va. 621, 225 S.E.2d 218 (1976). *See generally* 53 Am.Jur.2d *Master-Servant* §§ 411–440 (1970 & Supp.1990).

9. At least one intermediate appellate court has construed its human rights act to provide for strict liability of the employer for sexual harassment of its employees by supervisory personnel. *E.g., Board of Dir., Green Hills Country Club v. Illinois Human Rights Comm'n,* 162 Ill.App.3d 216, 113 Ill.Dec. 216, 514 N.E.2d 1227 (1987). The HRC argues that this construction should be the rule under our Act and suggests that the federal courts so hold, citing *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). We disagree. *Monell,* in holding that local governmental agencies were "persons" under 42 U.S.C. § 1983, and, therefore, subject to suit, expressly held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.... [I]t is when execution of a government's policy or custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. at 694, 98 S.Ct. at 2037–38, 56 L.Ed.2d at 638. *Pembaur* did not change this rule, but added that "where action is directed by those who establish governmental policy, the municipality is equally responsible[.]" 475 U.S. at 481, 106 S.Ct. at 1299, 89 L.Ed.2d at 464. *See* Part IV(B), *infra.*

10. Part of the rationale for this rule rests on the assumption that supervisory personnel are deemed to be carrying out management policy and have more confidence or trust reposed in them by the employer. *See Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.,* 755 F.2d 599 (7th Cir.1985). Moreover, as *Meritor, supra,* indicates, it is often the employer's supervisory personnel who engage in what is termed *"quid pro quo"* sexual harassment, i.e., the holding out of job benefits in return for sexual favors. This is to be distinguished from the "hostile or offensive environment" sexual harassment cases which arise from acts committed at the work place by coworkers. *Meritor* quoted this statement from *Henson v. Dundee,* 682 F.2d 897, 902 (11th Cir.1982):

> "'Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets.'" 477 U.S. at 67, 106 S.Ct. at 2405, 91 L.Ed.2d at 59.

*See also Yates v. Avco Corp.,* 819 F.2d 630 (6th Cir.1987).

11. Although it can be argued that *Meritor* did not decide the employer's liability issue because the court declined "to issue a definitive rule on

*tek v. USAIR, Inc.*, 830 F.2d 552 (4th Cir. 1987); *Yates v. Avco Corp.*, 819 F.2d 630 (6th Cir.1987); *North v. Madison Area Ass'n for Retarded Citizens Dev. Centers Corp.*, 844 F.2d 401 (7th Cir.1988); *Hall v. Gus Constr. Co., Inc.*, 842 F.2d 1010 (8th Cir.1988); *E.E.O.C. v. Hacienda Hotel*, 881 F.2d 1504 (9th Cir.1989); *Vance v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503 (11th Cir.1989); *College Town v. Massachusetts Comm. Against Discrimination*, 400 Mass. 156, 508 N.E.2d 587 (1987).[12]

▇ Mrs. Paxton argues that the Administrative Director should be considered her employer, notwithstanding the language of W.Va.Code, 50–1–9, which authorizes the Magistrate to hire her and which defines her employment as at-will.[13] Mrs. Paxton argues that her salary is paid from the judicial budget, that she is subject to the direction and control of the administrative office,[14] and that the personnel manual that existed at the time of her hiring required the Administrative Director's approval before new personnel could be hired by a magistrate.[15]

In order to consider the magistrate assistant an employee of the Administrative Director, we would have to conclude that the Administrative Director had the ability to hire and fire her, which is expressly contrary to W.Va.Code, 50–1–9. Moreover, we would have to find that the Administrative Director exercised the right to control the day-to-day performance of the magistrate assistant's work. The right of control rests with the individual magistrate, subject to rules prescribed by the Supreme Court of Appeals or the circuit judge and the duties specifically set out in W.Va. Code, 50–1–9.[16] The administrative guide-

employer's liability," the Court further explained:

"[W]e do agree with the [Equal Employment Opportunity Commission] that Congress wanted courts to look to agency principles for guidance in this area. While such common-law principles may not be transferable in all their particulars to Title VII, Congress' decision to define 'employer' to include any 'agent' of an employer, 42 U.S.C. § 2000e(b), surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible. For this reason, we hold that the Court of Appeals erred in concluding that employers are always automatically liable for sexual harassment by their supervisors. See generally Restatement (Second) of Agency §§ 219–237 (1958). For the same reason, absence of notice to an employer does not necessarily insulate that employer from liability. Ibid." 477 U.S. at 72, 106 S.Ct. at 2408, 91 L.Ed.2d at 63.

**12.** Some state courts do not make a distinction between supervisory personnel and the employee's coworkers. *Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Comm'n, supra.* Cf. *Glasgow v. Georgia-Pacific Corp., supra,* (recognizing vicarious liability for acts of the owner, manager, partner, or corporate officer, but not supervisory personnel, as such).

**13.** For the text of W.Va.Code, 50–1–9, see note 1, *supra.*

**14.** The position of administrative director was created under Article VIII, Section 3 of the West Virginia Constitution. The director handles the general administrative work of the judicial system on behalf of the West Virginia Supreme Court of Appeals. Under this constitutional provision, this Court is given "general supervisory control over all intermediate appellate courts, circuit courts, and magistrate courts."

**15.** The pertinent language from the personnel manual existing at the time is found in section 5.2: "Regardless of where the responsibility for selecting potential employees resides, the qualifications of all prospective judicial employees will be reviewed prior to his being hired by the Administrative Director. No judicial employees will be hired until approved by the Administrative Director."

**16.** The relevant portion of W.Va.Code, 50–1–9, states:

"A magistrate assistant shall have such duties, clerical or otherwise, as may be assigned by the magistrate and as may be prescribed by the rules of the supreme court of appeals or the judge of the circuit court, or the chief judge thereof if there is more than one judge of the circuit court. In addition to these duties, magistrate assistants shall perform and be accountable to the magistrate court clerks with respect to the following duties:

"(1) The preparation of summons in civil actions;

"(2) The assignment of civil actions to the various magistrates;

"(3) The collection of all costs, fees, fines, forfeitures and penalties which may be payable to the court;

"(4) The submission of such moneys, along with an accounting thereof, to appropriate authorities as provided by law;

"(5) The daily disposition of closed files which are to be located in the magistrate clerk's office;

line giving the Administrative Director the right to approve the hiring is only designed to ensure that the person hired meets the qualifications prescribed in the personnel manual.

 A more common sense view is to consider the Magistrate as the employer of the magistrate assistant. The question then becomes whether the Magistrate is an employee of the Administrative Director such that his misconduct is chargeable to the Administrative Director. We do not believe the Magistrate meets the definition of an employee of the Administrative Director.

First, the Magistrate is not hired by the Administrative Director, but is elected by the voters. *See* W.Va.Code, 50–1–1. Second, the Magistrate cannot be removed from office by the Administrative Director, but can only be removed by a proceeding

> "(6) All duties related to the gathering of information and documents necessary for the preparation of administrative reports and documents required by the rules of the supreme court of appeals or the judge of the circuit court, or the chief judge thereof if there is more than one judge of the circuit court;
> "(7) All duties relating to the notification, certification and payment of jurors serving pursuant to the terms of this chapter;
> "(8) All other duties or responsibilities whereby the magistrate assistant shall be accountable to the magistrate court clerk as the magistrate shall determine."

17. W.Va.Code, 50–1–5 (1976), provides:
> "A magistrate may be removed from office in the manner provided in section seven [§ 6–6–7], article six, chapter six of this Code. In addition to the grounds for removal enumerated in section three [§ 6–6–3], article six, chapter six of this Code, a magistrate may be removed from office for conviction of a felony, for conviction of a misdemeanor involving moral turpitude or a duty of the office or for willful violation of this chapter or any rule, regulation or order provided for in this chapter. In addition to other methods provided by law, removal proceedings may be initiated upon the motion of a judge of the circuit court of the county.
> "A magistrate may be censured or temporarily suspended in accordance with the rules of the supreme court of appeals."

18. The relevant provision of Article VIII, Section 6 of the West Virginia Constitution states:

brought under W.Va.Code, 6–6–7 (1985), or a "proceeding ... initiated upon the motion of a judge of the circuit court of the county." W.Va.Code, 50–1–5.[17] Third, while the Administrative Director may exercise some general supervisory control over the Magistrate through the administrative rules promulgated by the Supreme Court of Appeals, Article VIII, Section 6 of the West Virginia Constitution gives the general supervisory control of the magistrate court to the circuit court.[18] Moreover, Article VIII, Section 10 of the West Virginia Constitution vests the circuit court with the power to divide the work of the magistrate court.[19] The circuit court's control over the magistrate court is also made explicit by statute.[20]

In light of the foregoing, we find that the Administrative Director is neither Mrs. Paxton's employer nor the employer of the Magistrate. We, therefore, affirm the cir-

> "Subject to the supervisory control of the supreme court of appeals, each circuit court shall have general supervisory control over all magistrate courts in the circuit. Under the direction of the chief justice of the supreme court of appeals, the judge of the circuit court, or the chief judge thereof if there be more than one judge of the circuit court, shall be the administrative head of the circuit court and all magistrate courts in the circuit."

19. The pertinent portion of Article VIII, Section 10 of the West Virginia Constitution states:
> "The division of the business of a magistrate court in any court in which there shall be more than one magistrate of such court between the magistrates thereof so as to promote and secure the convenient and expeditious transaction of such business shall be determined in such manner or by such method as shall be prescribed by the judge of the circuit court of such county, or the chief judge thereof, if there be more than one judge of such circuit court."

20. For example, W.Va.Code, 50–1–4, requires a magistrate "who serves five thousand or less in population [to] devote such time to his public duties as shall be required by rule or regulation of the judge of the circuit court[.]" Under W.Va.Code, 50–1–6, if there is a vacancy in the magistrate court, it is filled by a circuit judge. The duties of the chief magistrate are set out in W.Va.Code, 50–1–7 (1978), and the appointment is made by the circuit court. The magistrate court clerk is appointed by the circuit court and serves as an at-will employee under W.Va.Code, 50–1–8 (1987), as do the magistrate court deputy clerks. *See* W.Va.Code, 50–1–9a (1989).

cuit court's ruling discharging the Administrative Director from these proceedings.

## B.

Notwithstanding the lack of liability on the part of the Administrative Director under principles of *respondeat superior,* the judicial budget is not necessarily immune from paying the judgment in this case. Unquestionably, the magistrate office is a part of the judicial system, and its employees are paid from the judicial budget. Moreover, the Magistrate, under the test outlined above, would qualify as the employer of the magistrate assistant.

The federal courts have confronted a similar question in civil rights suits brought under 42 U.S.C. § 1983.[21] This statute has been said to create constitutional tort liability. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Monell v. Department of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In Section 1983 litigation, the federal courts have developed a principle that allows a local governmental agency to be held monetarily liable even though it was not aware of, nor condoned, the act of its agent. In order for a municipality to be found liable, the agent must be exercising final policy decisions in the area where the discrimination claim arises. For example, in *Pembaur v. City of Cincinnati, supra,* the city was found liable for the forcible entry into a medical clinic by deputy sheriffs acting under the direction of the sheriff and the prosecuting attorney:

"Municipal liability attaches only where the decision-maker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the ex-

ercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. *See, e.g., Oklahoma City v. Tuttle,* 471 U.S. [808], at 822–824 [105 S.Ct. 2427, at 2435–2436, 85 L.Ed.2d 791]. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable. Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law. However, like other governmental entities, municipalities often spread policymaking authority among various officers and official bodies. As a result, particular officers may have authority to establish binding county policy respecting particular matters and to adjust that policy for the county in changing circumstances." 475 U.S. at 481–83, 106 S.Ct. at 1299–1300, 89 L.Ed.2d at 464–65. (Footnotes omitted).

In *St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), the Supreme Court addressed the question of who is a final policymaker, such that adverse action taken by such individual will subject the governmental entity to liability. A city architect, employed by the city's Community Development Agency (CDA), filed a Section 1983 action against the city claiming that he had been fired because he filed an employee's grievance. The city contended that the architect was laid off because of economic cutbacks. More importantly, because the decision to lay off the architect could be appealed to a civil service commission, the city challenged its liability by asserting that the director of the CDA was not a final policymaker in

---

**21.** 42 U.S.C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immuni-

ties secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

making lay-off decisions.[22]

The Court in *Praprotnik* initially recognized that a governmental entity could not escape Section 1983 liability if it had adopted unconstitutional policies or permitted their existence through a widespread practice.[23] Here, there is no claim of a policy, or longstanding custom, or practice in the judicial system of discrimination based on pregnancy.

When addressing the question of how final policymakers might be identified, the *Praprotnik* court agreed with the city's position and held that the architect's director did not have final decision-making authority because the decision to lay him off was reviewable by the civil service commission:

> "[A]s the *Pembaur* plurality recognized, the authority to make municipal policy is necessarily the authority to make *final* policy. 475 U.S., at 481–484 [106 S.Ct. 1292, 89 L.Ed.2d 452]. When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." 485 U.S. at 127, 108 S.Ct. at 926, 99 L.Ed.2d at 120. (Emphasis in original).

**22.** *Praprotnik* was a plurality opinion. The concurring justices agreed that the director who laid off the architect was not a final policymaker, but refused to agree with the policymaking language given by the other four members. Mr. Justice Kennedy, the ninth member, did not participate.

**23.** *Praprotnik's* language is:
"First, whatever analysis is used to identify municipal policymakers, egregious attempts by local governments to insulate themselves from liability for unconstitutional policies are precluded by a separate doctrine. Relying on the language of § 1983, the Court has long

Of more relevance to this case is *Williams v. Butler,* 863 F.2d 1398 (8th Cir.1988), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989), which involved a municipal judge who fired two court clerks. The clerks witnessed the judge deliberately destroying traffic tickets, and one of them reported the incident to the police. When the judge learned of this, he fired the clerk. The other clerk claimed that she was harassed by the judge until she resigned. Both clerks filed Section 1983 suits, and the district court found that the judge had the final decision on hiring and firing and, thus, that the city was liable for the judge's actions. On appeal, the case was affirmed by a divided court, with the majority giving its analysis under *Pembaur:*

> "But by delegating final policymaking authority to Butler the City exposed itself to liability for any unconstitutional actions taken by him pursuant to that authority. *See Pembaur,* 475 U.S. at 480–81, [89 L.Ed.2d at 463] 106 S.Ct. at 1298–99. It begs the question to say that because the City did not expressly authorize Williams's termination the City can not be held liable. Because he was given final policymaking authority, Butler was, in effect, the City; his actions were the City's actions....

> "Another predicate for the City's liability is that the Arkansas General Assembly, Ark.Stat.Ann. § 22–704.1(45) (Supp. 1985), authorized municipal judges to employ persons to fill staff positions in that court. As noted in *Pembaur* at 483, [89 L.Ed.2d at 465] 106 S.Ct. at 1300 'authority to make municipal policy may be granted directly by legislative enact-

recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.' *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–168 [90 S.Ct. 1598, 26 L.Ed.2d 142] (1970). That principle, which has not been affected by *Monell* or subsequent cases, ensures that most deliberate municipal evasions of the Constitution will be sharply limited." 485 U.S. at 127, 108 S.Ct. at 925–26, 99 L.Ed.2d at 120.

ment.' This places municipal judges in the City of Little Rock as the official policymaker in hiring and firing staff. And, Butler in his official capacity as a municipal judge was exercising traditional municipal functions. It does appear both by legislative enactment and by a long established custom and practice that Butler was the official policymaker for the hiring and firing of his staff." 863 F.2d at 1403. (Footnote omitted).

There is an interplay of these same principles when Title VII protection is invoked for incidents of sexual discrimination or harassment in the work place.[24] As earlier pointed out, the Supreme Court in *Meritor Savings Bank v. Vinson, supra,* outlined generally when an employer may be found liable for sexual harassment by supervisory personnel and co-employees. These concepts are not foreign to Section 1983 suits. While liability under a final policymaker theory has not been directly addressed in Title VII cases, as it has been developed in Section 1983 cases, it appears that when state officials are sued in a Title VII context, damages are paid by the governmental agency. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). *See Lowe v. City of Monrovia,* 775 F.2d 998 (9th Cir.1985). *Cf. Gutierrez v. Municipal Court,* 838 F.2d 1031 (9th Cir. 1988); *Montoya v. City of Colorado Springs,* 770 P.2d 1358 (Colo.App.1989).[25]

■ From a review of these cases, several principles emerge which are useful in interpreting our own Act.[26] Under federal law, both in a Section 1983 and a Title VII suit, a governmental agency is not automatically liable for the discriminatory acts of its employees unless it knew, or should have known, of them and did nothing to correct them. Where officers or supervisory personnel commit such acts, the employer may be held liable without a showing that it knew or reasonably should have known of the misconduct, unless the supervisory personnel was acting beyond the scope of his employment. Finally, we believe if a public employee is acting as a final policymaker for an agency in an area which gives rise to a discriminatory act, the employer-agency will be liable for the judgment.

■ In the present case, the Magistrate, by statute, had the final decision to hire or fire his magistrate assistant. He was the final policymaker, and his actions were thus chargeable to the entity for whom he worked—the judicial system. It is not urged that judicial immunity protects Magistrate King. In light of *Forrester v. White,* 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988), such a contention would be unavailing because the magistrate was acting in an administrative capacity, and not a judicial capacity, when he fired his assistant. Moreover, the parties agree that even if the Magistrate was entitled to claim immunity under Article VI, Section 35 of the West Virginia Constitution, it would

**24.** Title VII is comprised of a variety of sections dealing with discrimination. 42 U.S.C. § 2000e–2(a), relating to employment provides, in relevant part:

"It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

**25.** Several states have found the governmental entity liable for the discriminatory act of its employees without any extended discussion of the reason. *See Anspach v. City of Livonia,* 140 Mich.App. 403, 364 N.W.2d 336 (1985); *Allegheny County v. Wilcox,* 76 Pa.Commw. 584, 465 A.2d 47 (1983); *City of Portland v. Bureau of Labor and Indus.,* 298 Or. 104, 690 P.2d 475 (1984).

**26.** While it is true that we are not bound by the federal law, we have adopted federal precedent when we believed it was compatible with our human rights statute. *See, e.g., Frank's Shoe Store v. Human Rights Comm'n, supra.*

not be available under *Kerns v. Bucklew,* 178 W.Va. 68, 357 S.E.2d 750 (1987).[27]

We conclude that the back pay, as well as the $2500 incidental award,[28] are payable out of the judicial budget.[29] Accordingly, we reverse and remand the case for further wage calculations.

Reversed and remanded.

McHUGH, J., deemed himself disqualified and did not participate in the consideration or decision of this case.

---

**27.** Syllabus Point 1 of *Kerns v. Bucklew* states:

"In addition to the overriding effect of the supremacy clause of the *Constitution of the United States* (art. VI, cl. 2) upon contrary state law, federal legislation which is expressly authorized by section 5 of the fourteenth amendment to the *Constitution of the United States* and which implements such amendment will by its own force override contrary state constitutional or statutory law, such as governmental immunity (*W.Va. Const.* art. VI, § 35), which state law provides less protection or relief than provided by the fourteenth amendment and its implementing legislation, such as the Equal Employment Opportunity Act of 1972, as amended, 42 *U.S.C.* §§ 2000e to 2000e–17 (1982)."

*Cf. Howlett v. Rose,* 496 U.S. ——, 110 S.Ct. 2430, 110 L.Ed.2d 332.

**28.** The $2500 incidental award was made pursuant to *Bishop Coal Co. v. Salyers,* 181 W.Va. 71, 380 S.E.2d 238 (1989).

**29.** A different result would have been reached had the Magistrate's decision to hire or fire been subject to review by a higher administrative authority, or if he were acting entirely outside the scope of his employment.