**INFORMATION LEASING CORPORATION, Appellant,**

v.

**GDR INVESTMENTS, INC., d.b.a. Pinnacle Exxon, et al., Appellees.**

[Cite as *Info. Leasing Corp. v. GDR Investments, Inc.*, 152 Ohio App.3d 260, 2003-Ohio-1366.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–020290.

Decided March 21, 2003.

William P. Coley II, for appellant.

Avtar Arora, pro se.

GORMAN, Judge.

{¶ 1} The plaintiff-appellant, Information Leasing Corporation ("ILC"), appeals from the order of the trial court rendering judgment in favor of the defendants-appellees, GDR Investments, d.b.a. Pinnacle Exxon, and Avtar S. Arora, in an action to recover $15,877.37 on a five-year commercial lease of an Automated Teller Machine ("ATM"). In its sole assignment of error, ILC argues that the trial court's judgment constituted "an abuse of discretion" because it failed to address the effect of R.C. 1301.01 on the issue of GDR's liability under the lease. For the following reasons, we reverse and remand this cause to the trial court.

{¶ 2} This is one of many cases involving ILC that have been recently before this court. ILC is an Ohio corporation wholly owned by the Provident Bank. ILC is in the business of leasing ATMs through a third party, or vendor. In all of these cases, the vendor has been a third-party corporation, JRA 222, Inc., d.b.a. Credit Card Center ("CCC"). CCC was in the business of finding lessees for the. machines and then providing the services necessary to operate them, offering the lessees attractive commissions. Essentially, CCC would find a customer, usually a small business interested in having an ATM available on its premises, arrange for its customer to sign a lease with ILC, and then agree to service the machine, keeping it stocked with cash and paying the customer a certain monthly commission. Usually, as in the case of GDR, the owner of the business was required to sign as a personal guarantor of the lease. The twist in this story is that CCC soon went bankrupt, leaving its customers stuck with ATMs under the terms of leases with ILC but with no service provider. Rather than seeking to find another company to service the ATMs, many of CCC's former customers, like GDR, simply decided that they no longer wanted the ATMs and were no longer going to make lease payments to ILC.

{¶ 3} The terms of each lease, however, prohibited cancellation. The pertinent section read, "LEASE NON–CANCELABLE AND NO WARRANTY. THIS LEASE CANNOT BE CANCELED BY YOU FOR ANY REASON, INCLUDING EQUIPMENT FAILURE, LOSS OR DAMAGE. YOU MAY NOT REVOKE ACCEPTANCE OF THE EQUIPMENT. YOU, NOT WE, SELECTED THE EQUIPMENT AND THE VENDOR. WE ARE NOT RESPONSIBLE FOR EQUIPMENT FAILURE OR THE VENDOR'S ACTS. YOU ARE LEASING THE EQUIPMENT 'AS IS', [sic] AND WE DISCLAIM ALL WARRANTIES, EXPRESS OR IMPLIED. WE ARE NOT RESPONSIBLE FOR SERVICE OR REPAIRS."

{¶ 4}   Either out of a sense of fair play or a further desire to make enforcement of the lease ironclad, ILC put a notice on the top of the lease that stated, "NOTICE: THIS IS A NON-CANCELABLE, BINDING CONTRACT. THIS CONTRACT WAS WRITTEN IN PLAIN LANGUAGE FOR YOUR BENEFIT. IT CONTAINS IMPORTANT TERMS AND CONDITIONS AND HAS LEGAL AND FINANCIAL CONSEQUENCES TO YOU. PLEASE READ IT CAREFULLY; FEEL FREE TO ASK QUESTIONS BEFORE SIGNING BY CALLING THE LEASING COMPANY AT 1-513-421-9191."

{¶ 5}   Arora, the owner of GDR, was a resident alien with degrees in commerce and economics from the University of Delhi, India.   Arora wished to have an ATM on the premises of his Exxon station in the hope of increasing business.   He made the mistake of arranging acquisition of the ATM through CCC. According to his testimony, a representative of CCC showed up at the station one day and gave him "formality papers" to sign before the ATM could be delivered.   Arora stated that he was busy with other customers when the CCC representative asked him to sign the papers.   He testified that when he informed the CCC representative that he needed time to read the documents before signing them, he was told not to worry and, in effect, given the CCC representative's word that the papers did not need his attention and that his signature was a mere formality.   Arora signed the ILC lease, having never read it.

{¶ 6}   Within days, CCC went into bankruptcy.   Arora found himself with an ATM that he no longer wanted.   Although the testimony was spotty, it appears that he never attempted to look for another service provider.   According to his testimony, he tried unsuccessfully to contact ILC to take back the ATM.  Soon Arora suffered a mild heart attack, the gas station went out of business, and the ATM, which had been in place for approximately eighteen days, was left sitting in the garage, no longer in use until ILC came and removed it several months later.

{¶ 7}   Unfortunately for Arora, the lease also had an acceleration clause that read, "DEFAULT.   If you fail to pay us or perform as agreed, we will have the right to (i) terminate this lease, (ii) sue you for all past due payment AND ALL FUTURE PAYMENTS UNDER THIS LEASE, plus the Residual Value we have placed on the equipment and other charges you owe us, (iii) repossess the equipment at your expense and (iv) exercise any other right or remedy which may be available under applicable law or proceed by court act."

{¶ 8}   The trial court listened to the evidence in this case, which was awkwardly presented due in large part to Arora's decision to act as his own trial counsel.   Obviously impressed with Arora's honesty and sympathetic to his situation, the trial court found that Arora owed ILC nothing.   In so ruling, the court stated that ILC "ha[d] not complied with any of its contractual obligations and that [Arora] appropriately canceled any obligations by him, if there really

were any." The court also found that ILC, "if they did have a contract, failed to mitigate any damages by timely picking up the machine after [Arora] gave them notice to pick up the machine."

{¶ 9} In its assignment of error, ILC asserts that the trial court "abused its discretion" by not applying R.C. 1301.01(A). Initially we note that the assignment is miscast, as it actually challenges the judgment as being contrary to law, not an abuse of discretion. The decision whether to apply the correct law to the case is, thankfully, not a matter of judicial discretion. This aside, we turn our attention to the Uniform Commercial Code and the world of lease financing.

{¶ 10} ILC contends, and we do not disagree, that the lease in question satisfied the definition of a "finance lease" under the UCC. See R.C. 1310.01(A)(7). A finance lease is considerably different from an ordinary lease in that it adds a third party, the equipment supplier or manufacturer (in this case, the now defunct CCC). As noted by White and Summers, "In effect, the finance lessee * * * is relying upon the manufacturer * * * to provide the promised goods and stand by its promises and warranties; the [lessee] does not look to the [lessor] for these. The [lessor] is only a finance lessor and deals largely in paper, rather than goods." 1 White & Summers, Uniform Commercial Code (3d Ed.1988) 20.

{¶ 11} One notorious feature of a finance lease is its typically noncancelable nature, which is specifically authorized by statute. R.C. 1310.46(A) provides in the case of a finance lease that is not a consumer lease, "[T]he lessee's promises under the lease contract become irrevocable and independent upon the lessee's acceptance of the goods." The same statutory section also makes clear that the finance lease is "not subject to cancellation, termination, modification, repudiation, excuse, or substitution without the consent of the party to whom it runs." R.C. 1310.46(B)(2).

{¶ 12} Because of their noncancelable nature, finance leases enjoy somewhat of a reputation. The titles of law review articles written about them reveal more than a little cynicism regarding their fairness: Strauss, Equipment Leases Under U.C.C. Article 2A—Analysis and Practice Suggestions. U.C.C. Revisions: Promises and Pitfalls (1992), 43 Mercer L.Rev. 853; King, Major Problems with Article 2A: Unfairness, Cutting Off Consumer Defenses, Unfiled Interest and Uneven Adoption (1992), 43 Mercer L.Rev. 869; Breslauer, Finance Lease, Hell or High Water Clause and Third Party Beneficiary Theory in Article 2A of the Uniform Commercial Code (1992), 77 Cornell L.Rev. 318; Heckman, Article 2A of the Uniform Commercial Code: Government of the Lessor, by the Lessor, and for the Lessor (1992), 36 S. & L.U.L.J. 303.

{¶ 13} The "hell or high water clause" referred to in one of these titles makes the lessee's obligations to the lessor survive no matter what—come hell or high

water. As described by Professors White and Summers, "The parties can draft a lease agreement that carefully excludes warranty and promissory liability of the finance lessor to the lessee, and that sets out what is known in the trade as a 'hell or high water clause,' namely, a clause that requires the lessee to continue to make rent payments to the finance lessor even though the [equipment] is unsuitable, defective, or destroyed." 1 White & Summers, supra, at 20. To offset this one-sidedness, the lessee is generally considered a third-party beneficiary of any warranties between the manufacturer and the lessor. Id. In short, the lessor is merely a disinterested provider of financing. As White and Summers describe the relationship, "The lessor's responsibility is merely to provide the money, not to instruct the lessee like a wayward child concerning a suitable purchase * * *. Absent contrary agreement, even if [, for example, a finance-leased] Boeing 747 explodes into small pieces in flight and is completely uninsured, lessee's obligation to pay continues." Id. at 25.

{¶ 14} Although fortunately not finding himself in the same situation as the hypothetical, Arora did find himself with an ATM that he did not want, and for which he felt he had no use after CCC dropped out of the picture. Some people complain about being stuck with the bill; Arora's complaint was that he was stuck with the ATM.

{¶ 15} Initially, we reject the trial court's analysis, which was that ILC did not satisfy its contractual obligations. This was an obvious error. ILC's only contractual obligation was to provide the ATM, which it did. Clearly ILC had an expectancy interest of $15,877.73 that it would lose if the lease were not enforced. We must reject also the trial court's doubts about whether Arora had any obligations under the lease—clearly he did—as well as the court's assertion that he "appropriately cancelled any obligations by him"—a statement that seems to willingly ignore the noncancelable nature of the lease.

{¶ 16} To begin the proper legal analysis, we note first that this was not a "consumer lease" expressly excepted from R.C. 1310.46(A). A "consumer lease" is defined in R.C. 1310.01(A)(5) as one in which the lessee is "an individual and who takes under the lease primarily for a personal, family, or household purpose." This would definitely not apply here, where the ATM was placed on the business premises of the Exxon station, and where the lessee was GDR Investments and not Arora individually. (Arora was liable individually as the personal guarantor of GDR's obligations under the lease.)

{¶ 17} Even commercial finance leases, however, are subject to certain defenses, including lack of acceptance and unconscionability. It is noteworthy that ILC argues that Arora irrevocably accepted the ATM by merely signing a certificate of acceptance. (ILC also indicates in its brief that five payments were

made on the lease, but it is unclear from the record who made these payments and when.)   According to the UCC, however, in the case of finance leases, acceptance occurs only after the lessee has been given a reasonable time to inspect the goods and either (1) signifies acceptance, (2) fails to make an effective rejection, or (3) does any act that signifies acceptance.   R.C. 1310.61(A).   The requirement that the lessee be. given a reasonable time cannot be circumvented. "Taking possession of the goods is not determinative of acceptance, nor is the signing of a form of acceptance before receipt of the goods, nor the making of a lease payment."   *Colonial Pacific Leasing Corp. v. J.W.C.J.R. Corp.* (Utah App.1999), 977 P.2d 541, 545.   "A 'reasonable time to inspect' under the UCC must allow an opportunity to put the product to its intended use, or for testing to verify its capability to perform as intended."   *Capitol Dodge Sales v. Northern Concrete Pipe* (1983), 131 Mich.App. 149, 158, 346 N.W.2d 535.   See, also, *Tri–Continental Leasing Corp. v. Law Office of Richard W. Burns* (Tex.App.1985), 710 S.W.2d 604, and *Horrocks v. Westfalia Systemat* (Utah App.1995), 892 P.2d 14.

{¶ 18}   Although it was available as a defense, it does not appear that Arora was entitled to claim a valid rejection of the goods in this case.   R.C. 1310.55(A) applies the UCC's "perfect tender" rule to finance leases, allowing the lessee to reject any goods that "fail in any respect to conform to the lease contract." Nothing in the record, however, indicates that Arora rejected the ATM because of its nonconformity, i.e., its failure to work mechanically as intended.   Rather, the record demonstrates quite clearly that he rejected it only because he no longer wanted an ATM after CCC went bankrupt.   Although the UCC adopts the "perfect tender" rule, it does not adopt the "perfectly happy tenderee" rule.

{¶ 19}   Certain defenses do remain, however.   First, the UCC expressly allows for the application of the doctrine of unconscionability to finance leases, both consumer and commercial.   R.C. 1310.06(A) authorizes the trial court to find "any clause of a lease contract to have been unconscionable at the time it was made * * *."   If it so finds, the court is given the power to "refuse to enforce the lease contract, * * * enforce the remainder of the lease contract without the unconscionable clause, or * * * limit the application of the unconscionable clause as to avoid any unconscionable result."   Id.

{¶ 20}   In this case, the trial court made no findings as to whether the finance lease was unconscionable.   The primary purpose of the doctrine of unconscionability is to prevent oppression and unfair surprise.   Calamari & Perillo, Contracts (3d Ed.1982), Section 9–40.   "Oppression" refers to substantive unconscionability and arises from overly burdensome or punitive terms of a contract, whereas "unfair surprise" refers to procedural unconscionability and is implicated in the formation of a contract, when one of the parties is either

overborne by a lack of equal bargaining power or otherwise unfairly or unjustly drawn into a contract. Id. at Sections 9–37 and 9–38.

{¶ 21} It should be pointed that, although harsh, many characteristics of a finance lease are not inherently unconscionable and, as we have discussed, are specifically authorized by statute. Simply because a finance lease has a "hell or high water clause" does not make it unconscionable. As noted, a finance lease is a separate animal—it is supposed to secure minimal risk to the lessor. At least one court has rejected the argument that an acceleration clause in a commercial finance lease is punitive and unconscionable in the context of parties of relatively equal bargaining power. See *Emlee Equip. Leasing Corp. v. Waterbury Transmission, Inc.* (1993), 31 Conn.App. 455, 468, 626 A.2d 307.

{¶ 22} At the heart of Arora's defense in this case was his claim that he was misled into signing the finance lease by the CCC representative and was unfairly surprised to find himself the unwitting signatory of an oppressive lease. This is clearly an argument that implicated procedural unconscionability. His claim of being an unwitting signatory, however, must be carefully balanced against the law in Ohio that places upon a person a duty to read any contract before signing it, a duty that is not excused simply because a person willingly gives into the encouragement to "just go ahead and sign." See *Whelan v. E.F. Hutton Credit Corp.* (1983), 8th Dist. No. 46724, 1983 WL 2923.

{¶ 23} Moreover, we note that courts have also recognized that the lessor may give, through word or conduct, the lessee consent to cancel an otherwise noncancelable lease. R.C. 1310.46(B)(2) makes a finance lease "not subject to cancellation, termination, modification, repudiation, excuse, or substitution *without the consent of the party to whom it runs*." (Emphasis supplied.) As noted by the court in *Colonial Pacific Leasing,* supra, the UCC does not say anything with respect to the form or content of the consent. 977 P.2d at 548. The *Colonial Pacific* court concluded, therefore, "that the consent may be oral and may be established by conduct that reasonably manifests an intent. * * * Any manifestations that the obligation of the lessee will not be enforced independently of the obligation that runs to the consenting party is sufficient." Id. The question whether consent has been given to a cancellation is a question of fact for the trier of fact. Id.

{¶ 24} We raise this point because the evidence indicates that there was some communication between Arora and ILC before ILC retrieved the ATM. It is unclear whether ILC removed the ATM at Arora's request, or whether the company was forcibly repossessing the equipment pursuant to the default provision of the lease. In view of the murkiness of the testimony, it is unclear when the ATM was taken back and when the final lease payment was made. One interesting question that arises from ILC's retrieval of the ATM, not addressed

in the record, is what ILC did with the equipment afterward. Did ILC warehouse the equipment for the next four and one-half years (conduct that would appear unprofitable and therefore unlikely) or did the company then turn around and lease the ATM to someone else? If there was another lease, was ILC actually seeking a double recovery on the ATM's rental value? In this regard, we note that the trial court ruled that ILC had failed to mitigate its damages, a finding that is not supported by the current record, but may well prove to be true upon further trial of the matter.

{¶ 25} In sum, this is a case that requires a much more elaborate presentation of evidence by the parties, and much more detailed findings of fact and conclusions of law than those actually made by the trial court. We sustain ILC's assignment of error upon the basis that the trial court did not apply the correct legal analysis, and that the evidence of record did not mandate a judgment in Arora's favor. Because of the number of outstanding issues and unresolved factual questions, we reverse the trial court's judgment and remand this case for a new trial consistent with the law set forth in this opinion.

Judgment reversed
and cause remanded.

PAINTER, P.J., and SUNDERMANN, J., concur.