INFORMATION LEASING CORPORATION, Appellee,

v.

KING, d.b.a. Helen's Kitchen, et al., Appellants.

[Cite as *Information Leasing Corp. v. King,* 155 Ohio App.3d 201, 2003-Ohio-5672.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–020830.

Decided Oct. 24, 2003.

202

Statman, Harris, Siegel & Eyrich, L.L.C., William B. Fecher, and Jill S. Levison, for appellee.

Ebner & Riker, L.L.P., and J. Timothy Riker, for appellants.

PAINTER, Judge.

{¶ 1} Defendant-appellant Helen G. King, owner of Helen's Kitchen, a restaurant in Jacksonville, North Carolina, signed a lease with plaintiff-appellee, Information Leasing Corporation ("ILC") for an automated teller machine ("ATM") to place in her restaurant. King made the first six lease payments to ILC but then stopped making payments. ILC sued King and her business for default on the lease. The trial court granted summary judgment in favor of ILC and awarded ILC $16,403.22 in damages and court costs. King now appeals.

{¶ 2} Given the numerous cases we have previously decided between ILC and other lessees, we have already ruled on many of the arguments that King presents in her appeal. Today, we affirm our previous holdings and affirm the trial court's grant of summary judgment in favor of ILC.

## I. The Same Story

{¶ 3} This case is similar to many others recently heard by this court.[1] ILC, an Ohio corporation wholly owned by the Provident Bank, is in the business of leasing ATMs through a third party, or vendor. In the ILC cases that have been before this court, including this one, the vendor has been a third-party corporation, Credit Card Center ("CCC"). CCC would find a customer, usually a small business interested in having an ATM available on its premises, arrange for its customer to sign a lease with ILC, agree to service the machine by keeping it stocked with cash, and pay the customer a monthly commission. Usually, as was the case with King, the owner of the business was required to sign as a personal guarantor of the lease.

{¶ 4} As we have described in previous ILC cases, the unfortunate twist in the story is that CCC went bankrupt, leaving its customers stuck with ATMs under the terms of leases with ILC but with no service provider. Many of CCC's former customers decided to stop making lease payments to ILC, only to be sued by ILC for default on their leases.

{¶ 5} In her affidavit in this case, King stated that a salesman had come into her restaurant and suggested that she lease an ATM. Four or five days later, the salesman presented papers for her to sign to lease the machine, and King signed them. According to ILC, on May 24, 2000, King signed a CCC application for the ATM lease. The CCC representative then mailed the application to ILC. On June 16, 2000, ILC agreed to enter the lease contract with King.

{¶ 6} King stated that her understanding of the lease was based on the salesman's explanations of it. She claimed that she did not recall him saying that she would be tied to a 60–month lease or that she would be expected to pay $300 per month. Her understanding was that the ATM would pay for itself through use by her customers and that even if there were not much use of the machine in a particular month, the most she would be accountable for would be $12 a month. The salesman also told her that the ATM could use the restaurant's existing

---

1. See *Information Leasing Corp. v. Borda*, 1st Dist. Nos. C–020725 and C–020750, 2003-Ohio-4834, 2003 WL 22103377; *Information Leasing Corp. v. Chambers*, 152 Ohio App.3d 715, 2003-Ohio-2670, 789 N.E.2d 1155; *Information Leasing Corp. v. GDR Invests., Inc.*, 152 Ohio App.3d 260, 2003-Ohio-1366, 787 N.E.2d 652; *Information Leasing Corp. v. Jaskot*, 151 Ohio App.3d 546, 2003-Ohio-566, 784 N.E.2d 1192; *Information Leasing Corp. v. Baxter*, 1st Dist. No. C–020029, 2002-Ohio-3930, 2002 WL 1769453.

telephone line, but this turned out to be incorrect. King had to install an additional telephone line, costing $13 a month. King also stated that though her understanding at the time she signed the lease was that CCC would be servicing the ATM, in reality, she was expected to put her own money in the ATM.

{¶ 7} Nothing in King's statement in the record explicitly explains why King decided to stop making payments on the lease for the ATM. But after about six months of making the lease payment of $285.14 a month, King ceased making payments.

## II. The Lease

{¶ 8} The lease that King signed with ILC was a one-page, ten-paragraph document. A paragraph on the top right stated that the lease was written in plain language and that it had legal and financial consequences. The paragraph urged the lessee to read the document carefully. The paragraph also invited the lessee to telephone the leasing company before signing the document, and it provided the telephone number for the lessee to call with any questions. The lease identified CCC as the vendor of the ATM, and King as the lessee.

{¶ 9} The term of the lease was 60 months, and it required monthly payments of $285.14. This was clearly stated on the lease. The second paragraph of the lease stated in bold type that the lessee could not cancel the lease for any reason. It also stated that the lessee had accepted the equipment and the vendor, and that the lessor was not responsible for equipment failure or the vendor's acts.

{¶ 10} The default paragraph of the lease stated that should King fail to perform as agreed, ILC would have the right to sue King for all past-due payments and all future payments under the lease. Under its eighth paragraph, the lease was characterized as a finance lease under Article 2A of the Uniform Commercial Code ("UCC").

{¶ 11} King signed the ILC lease on behalf of her business and as a guarantor. Directly above the authorized signature line in the lease, in capital letters, was a consent-to-jurisdiction or forum-selection clause. The clause read, "YOU AGREE THAT THIS AGREEMENT SHALL BE CONSTRUED AND GOVERNED ACCORDING TO THE LAWS OF THE STATE OF OHIO, AND YOU CONSENT TO THE JURISDICTION AND VENUE OF ANY COURT LOCATED IN THE STATE OF OHIO. YOU AND WE EXPRESSLY WAIVE ANY RIGHT TO TRAIL [sic] BY JURY." (Evidently, the drafter believed that the use of all capital letters emphasized the statement. While that is partly true, all capital letters are harder to read than capitals mixed with the use of lower case. CAPITALS AND LOWER CAPITALS, IN A LARGER FONT THAN OTHER TEXT FOR EMPHASIS, ARE MUCH EASIER TO READ.)

{¶ 12} After the signature block was a personal guaranty that read, "I/WE CONSENT TO THE PERSONAL JURISDICTION AND VENUE OF ANY COURT LOCATED IN THE STATE OF OHIO. I/WE EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY. THIS GUARANTY SHALL BE CONSTRUED AND GOVERNED ACCORDING TO THE LAWS OF THE STATE OF OHIO." King again signed in the space below both statements.

{¶ 13} We review a grant of summary judgment de novo.[2]  ILC was entitled to prevail on its summary-judgment motion only if (1) there was no genuine issue of material fact, (2) it was entitled to judgment as a matter of law, and (3) it appeared that reasonable minds could come to but one conclusion when viewing the evidence in favor of King, and that conclusion was adverse to King.[3]

### III.  Forum–Selection Clause

{¶ 14} King presents two assignments of error.  In her second assignment, King argues that the trial court erred in denying her motion to dismiss ILC's complaint because the trial court lacked jurisdiction and venue.  In essence, she argues that the forum-selection clause in the lease she signed was not valid or binding.

{¶ 15} It is well established that absent evidence of fraud or overreaching, a forum-selection clause contained in a commercial contract between business entities is valid and enforceable unless it can be clearly shown that enforcement of the clause would be unreasonable or unjust.[4]  The Ohio Supreme Court has held that a valid forum-selection clause is one legal arrangement by which parties to a contract may waive the due-process requirement for personal jurisdiction and consent to the jurisdiction of a particular court system.[5]

{¶ 16} In two previous cases, *Information Leasing Corp. v. Baxter* and *Information Leasing Corp. v. Jaskot,*[6] we analyzed the forum-selection clause contained in similar ILC leases.  In both cases we concluded that the forum-selection clauses were valid.  We reach the same conclusion in this case.

---

**2.**  See *Doe v. Shaffer* (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243.

**3.**  See *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241.

**4.**  See *Kennecorp Mtge. Brokers, Inc. v. Country Club Convalescent Hosp., Inc.* (1993), 66 Ohio St.3d 173, 610 N.E.2d 987, syllabus.

**5.**  Id. at 175, 610 N.E.2d 987;  See, also, *Jaskot,* supra, at ¶ 7.

**6.**  See *Baxter,* supra, 2002-Ohio-3930 and *Jaskot,* supra, 151 Ohio App.3d 546, 2003-Ohio-566, 784 N.E.2d 1192.

{¶ 17} We must first determine whether the lease was a commercial or a consumer lease. In both *Baxter* and *Jaskot,* as well as in King's situation, the lessee was the owner of a for-profit commercial enterprise. Unlike a consumer who enters into a contract with a commercial entity, a person owning and running his or her own business is presumed to have some experience in contractual and business matters. Therefore, just as we held that the leases in both *Baxter* and *Jaskot* were commercial leases, we conclude that King's lease was a commercial lease.

{¶ 18} We next ask whether the forum-selection clause was the product of fraud or overreaching. King argues that she was not a sophisticated business-person and did not understand certain terms of the agreement such as "jurisdiction" and "venue." She also argues that the forum-selection clause was printed in small type.

{¶ 19} King's argument that she lacked commercial sophistication is similar to the argument advanced by the lessee in *Jaskot.* It fails here, as it did in *Jaskot,* because the lack of sophistication of one commercial party to the agreement is not a sufficient basis to invalidate a forum-selection clause in a commercial contract.[7] Thus, even if King truly were inexperienced in business matters, despite owning her own business for 20 years, her lack of knowledge of legal terms and unfamiliarity with lease agreements could not invalidate the forum-selection clause.

{¶ 20} In addition, at the top right of the lease, ILC included a written notice advising King to read the contract carefully, informing her that the contract had financial and legal consequences and advising her to ask questions before signing. While we understand that the terms "jurisdiction" and "venue" are not under-stood by all businesspeople (or all lawyers or judges, for that matter), the balance of the clause clearly indicated that the contract would be governed by Ohio law. King chose to sign a contract she apparently did not understand and chose not to seek help in understanding it before she signed it. The Ohio Supreme Court has held that if a person in King's position can read and is not prevented from reading what she signs, she alone is responsible for her decision to sign the contract.[8]

{¶ 21} We also disagree with King's assessment that the size of the forum-selection clause was smaller than the type on the rest of the lease. The first time the clause appeared it was in all capital letters and in larger type than most of

---

7. *Jaskot,* supra, at ¶ 17.

8. See *Baxter,* supra, at ¶ 10; *Haller v. Borror Corp.* (1990), 50 Ohio St.3d 10, 14, 552 N.E.2d 207.

the lease. Plus, the very fact that the forum-selection clause was printed twice in a one-page lease belies the argument that ILC was somehow attempting to hide it.

{¶ 22} Therefore, we conclude that the forum-selection clause in the lease between ILC and King was not the product of fraud or overreaching.

{¶ 23} Finally, we must ask whether it would be unreasonable or unjust to enforce the forum-selection clause. We must determine whether the chosen forum was so inconvenient that it, in effect, afforded no remedy at all, thus depriving litigants of their day in court.[9]

{¶ 24} A finding of unreasonableness or injustice must be based on more than inconvenience to the party seeking to avoid the forum-selection clause's requirements.[10] Instead, it must appear that enforcement in Ohio would be "manifestly and gravely inconvenient" to the party seeking to avoid enforcement such that the party "will be effectively deprived of a meaningful day in court."[11]

{¶ 25} We note that in *Baxter* and *Jaskot*, the lessees were from North Carolina and New York, respectively. In both cases, we held that litigation in Ohio would not have caused such injustice to the lessees that the forum-selection clause should be invalidated. Here, while King, whose business is in North Carolina, might find Ohio an inconvenient location to litigate the contract dispute, we conclude that there is no evidence that holding litigation in this state would be such a manifest or grave injustice that it would deny King a meaningful day in court.

{¶ 26} Therefore, we hold that the trial court correctly held that the forum-selection clause was valid and enforceable against King. Since the forum-selection clause was valid, there is no need for us to conduct a minimum-contacts analysis, as the parties have waived the due-process requirements of personal jurisdiction.[12]

{¶ 27} Therefore, we hold that the trial court appropriately had jurisdiction and venue in the dispute and overrule King's second assignment of error.

---

9. See *Kennecorp,* supra, 66 Ohio St.3d at 176, 610 N.E.2d 987; *Jaskot,* supra, at ¶ 18.

10. See *Jaskot,* supra, at ¶ 19.

11. Id. at ¶ 20, quoting *M/S Bremen v. Zapata Off–Shore Co.* (1972), 407 U.S. 1, 19, 92 S.Ct. 1907, 32 L.Ed.2d 513.

12. See *Kennecorp,* supra, 66 Ohio St.3d at 175, 610 N.E.2d 987.

## IV. Finance Lease

{¶ 28} In her first assignment of error, King argues that the trial court erred in granting ILC's motion for summary judgment because there were issues of material fact concerning whether the contract between ILC and King was a finance lease and whether fraud could be directly imputed to ILC.

{¶ 29} Though in three of our previous ILC cases we have characterized the ILC lease as a finance lease,[13] King now argues that the lease in this case was not actually a finance lease.

{¶ 30} As we stated in *Chambers*, "A finance lease differs from other leases. It is a 'three-party transaction involving a manufacturer/supplier, a finance lessor (usually a financing company), and a finance lessee (the party that will use the particular personalty that is the subject of the transaction). The finance lessee selects the property that it needs from the supplier. Then either the finance lessee or the supplier approaches a financing company, which purchases the property and, in turn, leases it to the lessee. The sine qua non of a finance lease is that the finance lessor acts as the supplier of money and not as a merchant of goods.' "[14]

{¶ 31} Under R.C. 1310.01(A)(7), a lease is a finance lease if three elements are present: (1) the lessor does not select, manufacture, or supply the goods, (2) the lessor acquires the goods or the right to possession and use of the goods in connection with the lease, and (3) the lessee agrees to certain contractual terms. King argues that neither the first nor the third element was present in this case.

{¶ 32} King argues that the first element was not present because ILC selected the ATM that was the subject of the lease. But the salesman who came to King's restaurant was a representative of CCC. At her meeting with this salesman, King signed the lease, which indicated the type of ATM and the serial number of the specific ATM that would be leased to her. CCC then sent the signed lease to ILC for its approval. We fail to see how this indicated that ILC selected the goods. We conclude that the first element of a finance lease was present.

{¶ 33} King next argues that the third element was missing. Under the statute, the third element can arise in one of four ways. The fourth option listed in the statute is that, in the case of nonconsumer leases, the lessee, before signing the lease, is provided with written notice by the lessor of (1) the identity of the supplier, unless the lessee has selected the supplier and directed the lessor to

---

13. See *GDR*, supra; *Chambers*, supra; and *Borda*, supra.

14. See *Chambers*, supra, 152 Ohio App.3d 715, 2003–Ohio–2670, 789 N.E.2d 1155, at ¶ 31, quoting Schoenfield, Commercial Law: The Finance Lease under Article 2A of the Uniform Commercial Code (1989), 1989 Ann.Surv.Am.L. 565, 566.

acquire the goods, (2) the lessee's entitlement to the promises and warranties under R.C. Chapter 1310 that have been provided to the lessor by the supplier or any third party in connection with or as part of the contract between the supplier and the lessor, and (3) the right of the lessee to communicate with the supplier and to receive an accurate statement of the promises and warranties, including disclaimers, limitations, and remedies.[15]

{¶ 34} ILC argues, and we agree, that the lease itself provided the necessary written notice to King of the identity of the supplier, her entitlement to promises and warranties provided to the lessor, and her right to communicate with the supplier. The lease informed King that CCC was the vendor and supplier of the ATM. The second paragraph of the lease stated, "Any warranties the vendor gave to us, if any [sic], we hereby assign (pass) to you. You may contact the vendor for a statement of such warranties, if any." The eighth paragraph of the lease stated, "You agree that this is a 'finance lease' under Article 2A—Leases of the Ohio Uniform Commercial Code. By signing this lease, you agree that either (a) you have reviewed, approved, and received a copy of the Supply Contract or (b) that we have informed you of the identity of the Supplier, that you may have rights under the Supply Contract, and that you may contact the Supplier for a description of those rights."

{¶ 35} We conclude that the lease in this case met the statutory requirements of a finance lease. Besides the statutory analysis, it is worth noting that the lease itself stated that it was a finance lease. In addition, in our prior ILC cases, we found the ILC leases to be finance leases. In doing so, we emphasized that the transaction at issue was the essence of a finance lease, in that the lessor acted merely as a supplier of money and did not act as a supplier of goods or services.

{¶ 36} Therefore, the trial court did not err in this case when it determined that, as a matter of law, the lease in question was a finance lease.

## V. Agency

{¶ 37} King next advances an agency argument. She contends that the trial court erred in granting summary judgment when an issue of material fact remained as to whether fraud could be directly imputed to ILC because of its agency relationship with CCC.

{¶ 38} King argues that the CCC representative who came to her restaurant and presented the lease papers to her was an agent of ILC. We have previously considered exactly this argument, most recently in *Chambers*. In that case, we

---

**15.** R.C. 1310.01(A)(7)(c)(iv); see, also, *Chambers*, supra, 152 Ohio App.3d 715, 2003-Ohio-2670, 789 N.E.2d 1155, at ¶ 32.

rejected the argument that the CCC representative had the general authority, real or apparent, to act for ILC.[16]

{¶ 39} Specifically, in *Chambers* we held that the CCC sales representative was not an apparent agent of ILC for the purpose of procuring a lease for the ATM, when the lessee had failed to demonstrate that the CCC representative had acted in any capacity beyond that of a loan-referral source.[17] We determined that the CCC representative simply had no power to bind ILC to a loan agreement.[18] We also concluded that the agency relationship had not been established because the lease itself specified the relationship among the parties.[19]

{¶ 40} In this case, King, as the party asserting the existence of an agency relationship, bore the burden of proof.[20] As in *Chambers*, the only evidence presented by King was that ILC furnished CCC with the forms it customarily used in its business. Alone, this fact was insufficient to establish an agency relationship. Such a practice is common in the commercial community.[21]

{¶ 41} In addition, the lease clearly indicated that CCC was the vendor, that ILC was the lessor, and that King was the lessee. It stated that ILC was not responsible for the vendor's acts. It also provided that the lease constituted the entire agreement between the lessee and the lessor. There was no evidence that the CCC salesperson represented that ILC and CCC were the same company or that ILC was aware that he was doing so.

{¶ 42} We conclude that the trial court correctly held that, as a matter of law, there was no agency relationship between ILC and CCC, and that fraud could not be imputed to ILC. Accordingly, we overrule King's first assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

DOAN, P.J., and GORMAN, J., concur.

---

16. See *Chambers,* supra, at ¶ 87;  see, also, *Borda,* supra, at ¶ 16.

17. See *Chambers,* supra, at ¶ 86.

18. Id.

19. Id. at ¶ 88.

20. Id. at ¶ 77.

21. Id. at ¶ 87.