# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2017 Term

_____

No. 16-1006

_____

FILED

**November 14, 2017**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**BLUE RIDGE BANK, INC.,**
Petitioner and Defendant Below

v.

**CITY OF FAIRMONT,**
A West Virginia Municipal Corporation,
Respondent and Plaintiff Below

_____

Appeal from the Circuit Court of Marion County
The Honorable Patrick N. Wilson, Judge
Civil Action No. 12-C-102

**AFFIRMED**

_____

Submitted: October 31, 2017
Filed: November 14, 2017

Webster J. Arceneaux, III, Esq.          S. Sean Murphy, Esq.
Spencer D. Elliott, Esq.                 Morgantown, West Virginia
Lewis, Glasser, Casey & Rollins, PLLC    Counsel for the Respondent
Charleston, West Virginia
Counsel for the Petitioner               Kevin V. Sansalone, Esq.
                                         Fairmont, West Virginia
                                         Counsel for the Respondent

**JUSTICE KETCHUM delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

Under W.Va. Code § 46-9-404(a)(1) (2000), an assignee takes an assignment subject to the account debtor's defenses and claims against the assignor. The rights of the assignee are subject to all terms of the agreement between the account debtor and assignor, as well as any defense or claim in recoupment arising from the transaction that gave rise to the contract (unless the account debtor has entered into an enforceable agreement not to assert defenses or claims). It makes no difference whether the defense or claim accrued before or after the account debtor was notified of the assignment.

**Justice Ketchum:**

In this case, the City of Fairmont ("the City") entered into a lease purchase agreement for equipment with Comvest, Ltd. In the agreement, Comvest agreed to pay for the City's acquisition of equipment in exchange for monthly lease purchase payments from the City. Comvest assigned its interest in the lease purchase agreement, including its right to the City's monthly payments, to Blue Ridge Bank ("the Bank"). It was later discovered that Comvest converted money that was designated to pay for the City's equipment. As a result, the City had to independently pay for much of its equipment out of pocket. Comvest is bankrupt and is not a party to this appeal.

The parties ask this Court whether the City may assert claims and defenses against the assignee Bank based on the assignor Comvest's conversion of funds designated for the purchase of the equipment. Under the Uniform Commercial Code (W.Va. Code §§ 46-1-101 to 10-104), an assignee generally takes an assignment subject to the debtor's claims and defenses against the assignor. We find that the Bank's rights under the assignment of the lease purchase agreement are subject to the City's claims and defenses against Comvest, and the City may assert claims and defenses against the Bank based on Comvest's conversion.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

This case arises from the City's ill-fated attempt to finance a municipal project. Prior to September 2009, the City's water filtration plant could not keep up with

1

demand for potable water. The City sought outside financing – in the form of a lease purchase agreement - to pay for equipment to upgrade its water filtration plant.[1]

On September 8, 2009, the City entered into a lease purchase agreement with Comvest. Under the agreement, the City was to order equipment from third-party vendors as it upgraded its water filtration plant. Upon delivery and acceptance of the equipment, the City would send the bill to Comvest. The agreement obligated Comvest to pay for the equipment, which was projected to have a total cost of $1,070,600.00. The agreement gave Comvest a security interest in the equipment, and it required the City to send Comvest 180 monthly payments of $8,244.84, totaling $1,484,071.20.

Two days later, on September 10, 2009, Comvest assigned its interest in the lease purchase agreement to the Bank. At the time of the assignment, the City had not yet submitted any bills for Comvest to pay on its equipment. The assignment provided that the Bank would transfer $1,070,600.00 to Comvest which Comvest would use to pay the third-party equipment vendors for the equipment when it was received and accepted by the City. In return, the City would send its monthly lease purchase payments to the Bank. Comvest's assignment of the lease purchase agreement to the Bank stated, in pertinent part, and with emphasis added, that:

> [Comvest] hereby sells, transfers, delivers, and assigns
> to [the Bank] . . . all of [Comvest's] right, title, *duties,*
> *obligations*, interest, estate, claims, and demands as lessor (i)
> in, to, and under the [Lease Purchase] Agreement . . . . and

---

[1] Under W.Va. Code § 8-12-11 (1969), "[T]he governing body of every municipality shall have plenary power and authority to enter into and execute a lease agreement for the obtaining of equipment or material."

2

(ii) in and to the Equipment, including any title thereto and security interest therein now owned or hereafter acquired under the [Lease Purchase] Agreement[.]

Comvest promptly notified the City of the assignment and directed the City to send its monthly $8,244.84 payments to the Bank.

After the lease purchase agreement was assigned, Comvest was to use the money it received from the Bank and pay the invoices the City submitted for its equipment. In other words, after the assignment of the lease purchase agreement, the relationship between the City, Comvest, and the Bank was as follows: (1) the City would order equipment from third-party vendors; (2) the City would send Comvest the bill upon delivery and acceptance of the equipment; (3) Comvest would pay the third-party vendor for the equipment using the money provided by the Bank; and (4) the City would send the Bank monthly lease purchase payments.

From September 2009 to March 2010, the City received and accepted equipment and invoices from third-party vendors for $573,054.42. Comvest paid the invoices as they were received from the $1,070,600.00 it had obtained from the Bank. On March 16, 2010, City officials discovered that Comvest had converted $506,823.06 of the $1,070,600.00 that the Bank sent to Comvest to pay for the City's equipment. Moreover, Comvest declared bankruptcy. The City paid for the rest of its equipment out of pocket.

The City attempted to renegotiate the amount of its monthly lease purchase payments to the Bank to recoup the $506,823.06 amount it was forced to independently pay for its equipment out of pocket. Therefore, the City wanted its monthly payments to

3

the Bank reduced from $8,244.84 to $3,782.50. The Bank did not consent to the City reducing its monthly payments.

The City filed a declaratory judgment action seeking an order declaring that it could reduce the amount it owes the Bank to reflect the money it paid out of pocket due to Comvest's conversion. The Bank filed an answer and a counterclaim demanding judgment for the City's missed monthly lease purchase payments in full, attorney's fees, and the cost of any repossession of the City's equipment. The City and the Bank filed competing motions for summary judgment. On April 24, 2016, the trial court issued an order granting summary judgment in the City's favor and denying summary judgment for the Bank. The Bank now appeals the circuit court's order.

## II.
## STANDARD OF REVIEW

The Bank requests that we reverse the circuit court's summary judgment order. "We have often stated that we review *de novo* a circuit court's entry of summary judgment under Rule 56 of the *West Virginia Rules of Civil Procedure*, and apply the same standard that the circuit courts employ in examining summary judgment motions."[2] That is, summary judgment is proper only when the moving party shows that there is no

---

[2] *Nicholas Loan & Mortg., Inc. v. W.Va. Coal Co-Op, Inc.*, 209 W.Va. 296, 299, 547 S.E.2d 234, 238 (2001).

4

genuine issue as to any material fact and that he/she is entitled to a judgment as a matter of law.[3]

## III.
## ANALYSIS

It is undisputed that Comvest, which is bankrupt and not a party to this appeal, purloined $506,823.06. As a result, the City had to pay that amount out of pocket to third-party equipment vendors. On the one hand, if the City is not allowed to reduce its monthly lease purchase payments to the Bank, it will effectively have to pay twice for the same equipment. On the other hand, if the City is allowed to reduce its monthly lease purchase payments, the Bank's return on its bargain with Comvest will be approximately halved. Regardless of which party prevails in this appeal, either the City or the Bank will lose $506,823.06 because of Comvest's wrongdoing. Our decision in this case is not made lightly.

The Bank and the City both agree that Comvest failed to pay for all of the City's equipment. They also agree that the lease purchase agreement was assigned to the Bank. Their dispute is whether the City may assert claims and defenses against the Bank based on Comvest's conversion of funds designated for the purchase of its equipment. The City asserts it can recoup the money it independently paid out of pocket for the equipment by reducing the amount the City owes to the Bank on the assigned lease purchase agreement.

---

[3] West Virginia Rule of Civil Procedure 56(c) [1998].

Before we examine the parties' arguments, we address three principles which will determine the law that applies to this dispute. First, Articles 2A and 9 of the Uniform Commercial Code apply to this case because the lease purchase agreement created both a leasehold interest and a security interest in personal property (that is, the City's equipment).[4]

Second, the lease purchase agreement is a "finance lease," which under the Uniform Commercial Code is defined, in pertinent part, as follows:

> "Finance lease" means a lease with respect to which: (i) The lessor does not select, manufacture or supply the goods; (ii) The lessor acquires the goods or the right to possession and use of the goods in connection with the lease; and (iii) One of the following occurs: (A) The lessee receives a copy of the contract by which the lessor acquired the goods or the right to possession and use of the goods before signing the contract[.][5]

The lease purchase agreement meets the definition of a "finance lease" for the following reasons: (1) it required the City, and not Comvest, to select and order the equipment from third-party vendors; (2) it gave Comvest a security interest in the equipment; and (3) the City was a party to the contract by which Comvest was given a security interest in the equipment.

---

[4] *See* W.Va. Code § 46-2A-102 (1996) ("This article applies to any transaction, regardless of form, that creates a lease."); W.Va. Code § 46-9-109(a) (2005) ("Except as otherwise provided in subjections (c) and (d) of this section, this article applies to: (1) A transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract[.]").

[5] W.Va. Code 46-2A-103(g) (2012).

6

Third, and finally, under Article 9 of the Uniform Commercial Code, the City is an "account debtor" on the lease purchase agreement because it is "a person obligated on an account[.]"[6] The definition of an "account" includes "a right to payment of a monetary obligation, whether or not earned by performance: (i) For property that has been or is to be . . . leased[.]"[7] In the lease purchase agreement, the City agreed to pay Comvest money for equipment to be leased.

Now we return to our main inquiry: whether the City may assert claims and defenses based on Comvest's conversion and recoup the money it independently paid out of pocket for the equipment by reducing its monthly payments to the Bank. The Bank contends that the assignment did not confer upon it any of Comvest's duties and obligations under the lease purchase agreement, so its right to the City's full monthly payments cannot be diminished by virtue of Comvest's conversion.

Generally, the assignment of a lease under the Uniform Commercial Code transfers to the assignee both the assignor's rights under the agreement *and* the assignor's duties and obligations. As W.Va. Code § 46-2A-303(5) (2000), provides:

> A transfer of "the lease" or of "all my rights under the lease", or a transfer in similar general terms, is a transfer of rights and, unless the language or the circumstances, as in a transfer for security, indicate the contrary, the transfer is a delegation of duties by the transferor to the transferee. Acceptance by the transferee constitutes a promise by the

---

[6] W.Va. Code § 46-9-102(3) (2013). Under the Uniform Commercial Code, a government, in this case a municipality, falls under the definition of a "person." W.Va. Code § 46-1-201(27) (2006).

[7] W.Va. Code § 46-9-102(2).

7

transferee to perform those duties. The promise is enforceable by either the transferor or the other party to the lease contract.

W.Va. Code § 46-2A-303(5), allows the parties to transfer the duties of the assignor (Comvest) to the assignee (the Bank). Comment 9 to W.Va. Code § 46- 2A-303 makes clear that this statute applies to commercial assignments.

The Bank asserts that the assignment of the lease purchase agreement required it to transfer $1,070,600.00 to Comvest who would pay for the City's equipment rather than the Bank paying the third-party equipment vendors directly. The Bank further contends that upon this payment to Comvest, it had no further duties under the assigned lease purchase agreement. However, the assignment between Comvest and the Bank plainly states that the Bank accepted the duties and obligations of Comvest. The assignment of the lease purchase agreement clearly provides, with emphasis added, that: "[Comvest] hereby sells . . . to [the Bank] all of [Comvest's] right, title, *duties, obligations*, [etc.]." Because the Bank accepted the duties and obligations of Comvest under the assignment of the lease purchase agreement, the City contends that it may assert defenses and claims against the Bank based on Comvest's conversion.

Ordinarily, an assignee takes an assignment subject only to the claims and defenses of the debtor against the assignor which accrue before the debtor receives notification of the assignment.[8] However, W.Va. Code § 46-9-404(a) (2000), provides that:

---

[8] *See generally*, Syl. Pt. 10, *Lightner v. Lightner*, 146 W.Va. 1024, 124 S.E.2d 355 (1962) ("Ordinarily an assignee acquires no greater right than that possessed

8

Unless an account debtor has made an enforceable agreement not to assert defenses or claims, and subject to subsections (b) through (e), inclusive, of this section, the rights of an assignee are subject to:

(1) All terms of the agreement between the account debtor and assignor and *any defense or claim in recoupment[9] arising from the transaction that gave rise to the contract*; and

(2) Any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives a notification of the assignment authenticated by the assignor or the assignee.

(Footnote and emphasis added). Comment 2 to W.Va. Code § 46-9-404(a)(1) further explains, with emphasis added, that: "[I]f the account debtor's defenses on an assigned claim arise from the transaction that gave rise to the contract with the assignor, *it makes no difference whether the defense or claim accrues before or after the account debtor is notified of the assignment*."

---

by his assignor, and he stands in his shoes; and an assignee takes subject to all defenses and all equities which could have been set up against an instrument in the hands of an assignor at the time of the assignment.").

[9] "Recoupment" is not defined in the Uniform Commercial Code. Black's Law Dictionary defines "recoupment," in part as "[t]he right of a defendant to have the plaintiff's claim reduced or eliminated because of the plaintiff's breach of contract or duty in the same transaction." Bryan A. Garner, Black's Law Dictionary at 1388 (9th ed. 2009). *See also*, *First Nat'l Bank of Louisville v. Master Auto Serv. Corp.*, 693 F.2d 308, 310 n.1 (4th Cir. 1982) ("Recoupment is the right of the defendant to have the plaintiff's monetary claim reduced by reason of some claim the defendant has against the plaintiff arising out of the very contract giving rise to the plaintiff's claim.").

One scholarly treatise, *Anderson on the Uniform Commercial Code*,[10] provides the following illustration of how W.Va. Code § 46-9-404(a)(1) applies to claims or defenses which accrue after the debtor's notification of the assignment:

> Retailer enters into an agreement with Wholesaler under which Wholesaler will deliver to Retailer fifty pieces of inventory per month. . . . The first installment is delivered in January. Retailer pays for the installment. In February, Wholesaler assigns the agreement to Financier. In March, Financier gives notice of the assignment to Retailer. In April, the second installment is delivered. Retailer makes payment to Financier. In May, the third installment is delivered. Within a few days of delivery, Retailer discovers that the first two installments are defective. Financier demands payment of the third installment.
>
> . . . . [S]ince Financier takes subject to all of the defenses and claims in recoupment that Retailer has against Wholesaler, Retailer could raise any breach of warranty claim [against Financier] that he may have. . . . Since the claims in recoupment arose out of the transaction that gave rise to the agreement, Retailer can raise his breach of warranty claim as to both the first installment that accrued before notification of the assignment and as to the second installment which accrued after notification.[11]

Other courts interpreting the Uniform Commercial Code provision embodied in W.Va. Code § 46-9-404(a)(1) agree that an account debtor may assert defenses and claims seeking recoupment of the debtor's funds against an assignee that

---

[10] Ronald A. Anderson & Lary Lawrence, 9 *Anderson on the Uniform Commercial Code* (3d ed. 1999).

[11] *Id.*, 9 *Anderson on the Uniform Commercial Code* § 318:16 at 460-61. (Footnote added)

10

arise from the contract between the account debtor and assignor – even when the claim or defense accrued after the account debtor was notified of the assignment.[12]

Therefore, we hold that under W.Va. Code § 46-9-404(a)(1) (2000), an assignee takes an assignment subject to the account debtor's defenses and claims against the assignor. The rights of the assignee are subject to all terms of the agreement between the account debtor and assignor, as well as any defense or claim in recoupment arising from the transaction that gave rise to the contract (unless the account debtor has entered into an enforceable agreement not to assert defenses or claims). It makes no difference whether the defense or claim accrued before or after the account debtor was notified of the assignment.

The Bank's rights under the assignment are subject to the City's defenses and claims for recoupment of the money the City paid out of pocket for its equipment. Additionally, Comvest's conversion of the money that was intended to be used to pay for

---

[12] *See, e.g., Pioneer Comm. Funding Corp. v. United Airlines, Inc.*, 122 B.R. 871, 883 (S.D.N.Y., 1991)("[New York's equivalent of W.Va. Code § 46-9-404(a)(1)] requires our review of the Presidential/United contract to see if a right of setoff is established therein. If it is, Pioneer takes its assignment subject to that right, regardless of when United received notification of the assignment."); *First Nat'l Bank of Louisville v. Master Auto Serv. Corp.*, 693 F.2d 308, 310-12 (4th Cir. 1982) (finding that, under Kentucky equivalent to W.Va. Code § 46-9-404(a)(1), debtor may assert defenses arising from assignor's breach of contract as setoff against amount owed assignee, even though defense accrued after assignment); *United Cal. Bank v. Eastern Mountain Sports, Inc.*, 546 F. Supp. 945, 963 (D. Mass. 1982) (stating as to account debtor's claims or defenses which arise from the assigned contract: "Regardless of when they accrue, these claims and defenses may be asserted by the account debtor as offsets against the amount owed the assignee on the contract or assigned account.").

11

the City's equipment is a defense which arises from the lease purchase agreement. Therefore, the City may assert claims and defenses based on Comvest's conversion against the Bank, even though they did not accrue until after the lease purchase agreement was assigned to the Bank. That is, unless the City entered into an enforceable agreement not to assert against the Bank the claims or defenses it has against its assignor, Comvest.

The Bank argues that the lease purchase agreement provides that the City may not assert claims or defenses which it has against the assignor Comvest. The lease purchase agreement states, in pertinent part, that: "The obligation of [the City] to make Rental Payments or any other payments required hereunder shall be absolute and unconditional in all events." This type of provision is commonly known as a "hell or high water" provision (*i.e.*, the lessee will pay rent "come hell or high water").[13] Furthermore, because the lease purchase agreement is a finance lease, the "hell or high water" provision is automatically incorporated into it through W.Va. Code § 46-2A-407(1) (1996).[14] W.Va. Code § 46-2A-407(1) states: "In the case of a finance lease that is not a consumer lease the lessee's promises under the lease contract become irrevocable and independent upon the lessee's acceptance of the goods."

---

[13] Peter Breslauer, "Finance Lease, Hell or High Water Clause, and Third Party Beneficiary Theory in Article 2A of the Uniform Commercial Code," 77 Cornell L. Rev. 318, 322 (1992).

[14] Cmt. 1, W.Va. Code § 46-2A-407 ("This section extends the benefits of the classic 'hell or high water' clause to a finance lease that is not a consumer lease. This section is self-executing; no special provision need be added to the contract.").

The City acknowledges that "hell or high water" provisions are generally enforceable in finance leases upon the lessee's acceptance of the goods. However, it contends that there are circumstances where a "hell or high water" provision cannot be used to preclude a lessee from asserting defenses against an assignee. The City asserts that this case falls into one of those exceptions because, as to the equipment that Comvest did not pay for, the City did not accept the equipment under the terms of the lease purchase agreement. Instead, after Comvest's conversion of the money that was intended to be used to pay for the City's equipment, the City had to deal directly with the third-party equipment vendors and independently pay for its equipment out of pocket. These out of pocket payments and purchases by the City were not made through the lease purchase agreement.

It is well-established that: "The hell or high water clause is not . . . watertight."[15] First, the plain terms of W.Va. Code § 46-2A-407(1) limit its application to *after* "lessee's acceptance of the goods" under the lease purchase agreement. Second, the comments to W.Va. Code § 46-2A-407 clarify that a "hell or high water" provision is subject to the lessee's revocation of acceptance of goods,[16] the lessor's obligation of good

---

[15] Breslauer, "Finance Lease, Hell or High Water Clause, and Third Party Beneficiary Theory in Article 2A of the Uniform Commercial Code," 77 Cornell L. Rev. at 327.

[16] Cmt. 1, W.Va. Code § 46-2A-407 ("The provisions of this section remain subject to . . . the lessee's revocation of acceptance (Section 2A-517)."

13

faith,[17] and certain warranty obligations of the lessor.[18]  Third, courts have found "hell or high water" provisions unenforceable where the lessor consented to cancellation of the lease[19] or where the lease was found to be unconscionable at the time it was entered into.[20]

The Bank has not directed us to a single case wherein a court enforced a "hell or high water" provision against a lessee who has not accepted the goods bargained for under the terms of the lease agreement or who has independently paid for the goods outside of the lease agreement.  By contrast, it has been noted:

> It is also common for personal property leases to contain so-called "hell or high water" covenants under which the lessee unconditionally agrees to make lease payments to the lessor notwithstanding any foreseeable or unforeseeable

---

[17] Cmt. 1, W.Va. Code § 46-2A-407 ("The provisions of this section remain subject to the obligation of good faith (Sections 2A-103(4) and 1-203)[.]").

[18] Cmt. 2, W.Va. Code § 46-2A-407 ("[T]he lessee may, however, have and pursue a cause of action against the lessor, *e.g.*, breach of certain limited warranties (Section 2A-210 and 2A-211(1)).").

[19] *Info. Leasing Corp. v. GDR Investments, Inc.*, 152 Ohio App.3d 260, 266, 787 N.E.2d 652, 657 (2003) (finding that "hell or high water" provision may not be enforceable against debtor where there was a genuine dispute as to whether the lessor consented to cancellation of lease"); *Colonial Pac. Leasing Corp. v. J.W.C.J.R. Corp.*, 977 P.2d 541, 548 (Utah Ct. App, 1999) ("We note that even the 'hell or high water' provision provides a mechanism by which a lessee can escape its harsh strictures. . . . . the consent of the party to whom the promise runs.").

[20] *Info. Leasing Corp.*, 152 Ohio App.3d at 264 & 266, 787 N.E.2d at 655-56 ("Even commercial finance leases, however, are subject to certain defenses, including . . . unconscionability. . . . [However,] simply because a finance lease has a 'hell or high water clause' does not make it unconscionable.").

consequences. While such "hell or high water" covenants are generally enforceable . . . , arguably they may not be enforced in situations in which a lessee lawfully withholds rental payments as a result of the lessor's failure to provide the lessee with peaceable possession of the leased equipment over the lease term.[21]

The record shows that between September 2009 and March 2010, the City accepted $573,054.42 worth of equipment that was paid for by Comvest under the lease purchase agreement. As to the equipment that was paid for by Comvest, the City's obligation to make rental payments to the Bank is irrevocable. However, by March 2010, Comvest converted $506,824.06 of the money that was designated to pay for the City's equipment. After Comvest's conversion, the City purchased the equipment itself and paid the third party vendors out of pocket. The lease purchase agreement provides that acceptance of the equipment is not complete until the City has submitted to Comvest a certificate of acceptance and a bill for the equipment. Instead of submitting its equipment bills to Comvest under the lease purchase agreement, the City was forced by Comvest's conversion to purchase the equipment itself by independently paying the third-party equipment vendors out of pocket. As to the $506,824.84 of equipment the City independently paid for out of pocket, the City did not purchase the equipment under the terms of the lease purchase agreement as required for the "hell or high water" provision to be enforceable under W.Va. Code § 46-2A-407.

---

[21] *Angelle v. Energy Builders Co., Inc.*, 496 So.2d 509, 513 (La. Ct. App. 1986) (internal citations and quotations omitted).

Because the City did not accept or purchase the equipment under the terms of the lease purchase agreement, we find that under W.Va. Code § 46-9A-404(a)(1), the City may assert its defenses or claims in recoupment arising from Comvest's breach of the agreement to reduce the amount it owes to the Bank on the assignment of the lease purchase agreement.[22]

## IV.
## CONCLUSION

The Bank took its assignment subject to the City's claims and defenses arising from Comvest's breach of the lease purchase agreement. Therefore, the City was entitled to recoup the amount it paid out of pocket to the third-party equipment vendors by reducing the amount it owes the Bank based on Comvest's conversion. We affirm the

---

[22] The Bank also contended the trial court erred in the following ways: (1) it failed to hold that the assignment, which was not signed by the bank, violated the statute of frauds; (2) it failed to find that Comvest met our four-part test in *Paxton v. Crabtree*, 184 W.Va. 237, 400 S.E.2d 245 (1990), for determining whether an agency relationship existed between Comvest and the City for purposes of respondeat superior; and (3) it failed to grant the Bank's *nunc pro tunc* motion to deem a previous motion timely filed.

First, the Bank waived its statute of frauds defense. Under West Virginia Rule of Civil Procedure 8(c) (1998), the statute of frauds is an affirmative defense that must be pleaded below. The Bank failed to plead statute of frauds in its responsive pleadings. Second, the Bank's argument that Comvest satisfied our four-part test for determining an agency relationship for purposes of respondeat superior is not relevant to this case because this appeal arises from contract claims, not tort claims. Third, the Bank's argument on the trial court's denial of its *nunc pro tunc* motion is based on W.Va. Trial Ct. R. 15.13 (2008), which provides that, in certain situations: "the Court *may*, upon satisfactory proof, enter an order permitting the document to be filed or served *nunc pro tunc* to the date it was first attempted to be e-filed and served." (Emphasis added). "[T]he word 'may' inherently connotes discretion." Syl. Pt. 1, in part, *Pioneer Pipe, Inc. v. Swain*, 237 W.Va. 722, 791 S.E.2d 168 (2016). We find nothing in the record indicating that the trial court abused its discretion under W.Va. Trial Ct. R. 15.13.

trial court's order granting summary judgment to the City and denying summary judgment to the Bank.

Affirmed.